JOEL J. PERRIN, ADMINISTRATOR OF THE ESTATE OF HORACE J. PERRIN, DECEASED, v. S. V. R. LEPPER, ADMINISTRATOR, ETC., AND LOUISA FISK, ET AL.

[See 47 Mich. 212; 49 Id. 342, 347; 56 Id. 351.]

*Testamentary powers—Wills—Construction—Executors and administrators—Accounting—Death of executor—Liability of representative—Partnership—Surviving partner—Duties of—Death of survivor—Trusts—Rights of beneficiaries—Fraudulent appropriation of trust fund—Laches of beneficiaries —Summary relief—Rights of third persons— Guardian and ward—Agreement between— Fraudulent character of—Equity practice — Reference to commissioner — Appealable orders.*

1. A testator, by his last will, gave to his son and only child, a minor, at the age of 21, $3,000, and $1,000 annually thereafter, until 25 years old, when he was to have $10,000 more, if, in the opinion of the executors named, he had used the amounts received in a judicious, frugal manner; and at the age of 35 years, or sooner, if the executors thought best, and upon the same conditions, he was to receive the possession of the balance of his father's estate, both real and personal, not otherwise disposed of under the will; but if at 25, and after the receipt of the $10,000, the son had squandered and wasted what he then had received, and if in the opinion of the executors, he would continue to do so, he then was to receive but the $1,000 annually, and the estate, subject to the other provis-

ions of the will, was to go to the legal issue of the son, and, if he died without issue, it was then to pass to the testator's legal heirs.

*Held*, that such will did not convey the estate to the executors named in trust, but only made them executors, with certain additional powers, under which, in certain contingencies, the estate might be made to pass from the son to others after the son had arrived at the age of 35 years.

2. There were five persons named as executors in the will, but one of whom qualified. He was a surviving partner of the intestate, and acted for 15 years as executor, and died without having rendered any account of his trust, and without paying the son anything after he was 24 years of age, who married and died without issue, leaving all his estate to his wife by will. The sole executor never passed upon the son's habits or conduct, and never undertook to exercise the power given to all the executors in that regard.

*Held*, assuming the power given by the will to be valid, it could not be executed by the sole executor, and after the death of the son could never be executed by any one; that upon the death of the father the title to the real estate vested in the son, and the son became the owner of all testator's personal property, subject to the debts of the estate and the special legacies, and which estate under the son's will, upon his death, passed to his widow, and the heirs of the father had no interest in the estate whatever; that it was not necessary for the son to reduce the estate willed to him to his possession before he could dispose of it, by will, to his wife.

3. *Paper Co. v. Fisk*, 47 Mich. 212, which construes the last will and testament of Joseph Sibley, considered, and followed.

4. An executor's obligation to account in the proper court rests, on his decease, upon his personal representative, who should observe the same rules in so doing as the executor, and should be held to the same strictness, so far as he has knowledge, or with a reasonable degree of diligence can obtain the same.

5. On the death of a surviving partner, who was also executor of the estate of his deceased partner, the representative of the former has no more right to the exclusive control of the copartnership books, papers, and property of the partnership estate than has the representative of the deceased partner.

6. The refusal of the trustee while living, and his representative after his death, to furnish information regarding the condition and management of the estate, and exhibit his account showing the result of the same, and the amount of the estate, after the trust had expired, to those entitled thereto, when properly

requested, severely criticised and condemned. Fairness between tenants in common, a relation creating the lowest grade of trusts, requires that this should be done.

7. A surviving partner, who is also made executor of the last will and testament of the deceased, and who assumes the guardianship of his only son, takes upon himself the most sacred obligations that can be imposed upon any trustee; and when the authority of a court of equity is properly invoked it will take care that the interests of the beneficiaries are protected, and will exercise great vigilance in scrutinizing the manner in which the trustee has discharged his trust obligations.'

8. It is the duty of one assuming to act as guardian of a minor, and the only son of his deceased partner, whose executor he also is, to look after his habits and education, and to secure for him the best advantages for business instruction, and at least to give him such an insight into the estate of his father, and such instruction in relation thereto, as will best qualify him for its successful management.

9. Among the indispensable duties and obligations imposed upon a surviving partner, who is also the executor of the last will and testament of his deceased partner, are the following:

*a*—To file in the probate court, not only a true and correct inventory of the individual property and assets of the estate, but also of the partnership property; and the latter should show who are the partners, the place where the firm carried on business, and the nature and character of the same, the terms of the copartnership, the capital contributed by each partner, and some statement of the assets and liabilities, so far as he knows them, or can ascertain them with any reasonable certainty.

*b*—To keep accurate and correct accounts of the estate, and all the assets thereof, showing the accumulations or losses thereon, keeping separate and distinct the individual estate from the partnership interest, and to exhibit such account or accounts whenever called upon to the heir or his attorneys, and to all persons interested in the estate.

*c*—In the shortest time reasonably consistent with the best interests of the estate, to collect in a sufficient amount of the assets to pay the just debts of the estate, and the specific bequests mentioned in the will; to defend the estate against all unjust claims; to ascertain and collect in all outstanding claims not well secured; and to ascertain and settle the net amount of the assets, and report the same, with a full account of his doings in relation thereto, to the probate court, and obtain its order for such further disposition of the same as may be proper to make.

*d*—To work for the best interests of the estate at all times, and so to keep, manage, and invest the property of decedent, that it can be turned over to the persons entitled to it, freed from complications with his own, or the property of others, at the earliest moment consistent with good management.

*e*—In case of doubt as to the proper construction of the will in regard to final disposition of the estate, to apply to the proper court, and have the matter settled, and take its direction in reference thereto.

10. Where the representative of the surviving partner files a bill offering to account for his intestate's administration of the firm assets, and the account he presents is so imperfect, confused, and manifestly fraudulent as to be an insufficient basis for accounting, and unfit for judicial investigation, and it appears that the surviving partner trafficked with the firm assets, and made large profits therewith, but has destroyed or suppressed the evidence, so that the amount of such profits cannot be ascertained with any degree of certainty, the rules of equity will not require the share of the deceased partner to be ascertained from such fragmentary and imperfect evidence as remains, or as the trustee or his representative sees fit to furnish.

11. In such case, where the share of the deceased partner in the firm at his death is known or can be ascertained with reasonable certainty, the court will apply the well-known rule that a *cestui que trust* may either follow the fund, and take it and the profits, or take the fund, with interest, in lieu of profits, to be computed in such manner and at such rate as will, in view of all the facts and circumstances, be in accordance with the principles of equity and justice. In such case the fraudulent trustee must be held to have elected, in taking the course he did, that this rule might be applied in case equity should be resorted to in the settlement of his accounts, and his estate must abide thereby. But in giving such summary relief the court will not omit to take into consideration the consequences of its decree, and will consider them in connection with the other circumstances in the case, and see to it that an oppressive or unjust result shall not be reached.

12. The precise sum the *cestui que trust* should receive or the trustee should pay is that which the former has lost by the failure of the latter to honestly and properly administer the trust. Where the trustee has misappropriated the funds, or neglected to properly invest them, the *cestui que trust* will be presumed to have lost at least the lawful interest upon the same; and, if the fund has been so used that the accumulations in the hands of the trustee reached beyond interest upon

the fund, the court will decree to the *cestui que trust* as his loss whatever may have been so received.

13. If a trustee fails or refuses to account, he may be charged with the trust fund, and such accumulations thereon as the best management of the most successful business man would be likely to secure for it. It will be presumed he has received so much or he would have reported his gains. If such gains be greater than compound interest, that may be allowed to the beneficiary; not on the ground that the fund is presumed to have earned a larger sum, but because the court will not allow the trustee to profit by his own wrong, and because as between him and the beneficiary the latter has the better right to the excess.

14. Where a trustee has shown an utter disregard for the interests of the beneficiary, and has deliberately planned to absorb the trust fund by his fraudulent appropriation thereof to his own use, and has attempted to destroy or suppress evidence of his management of the fund, and the profits received therefrom, and has so far succeeded in his purpose that no one but himself can trace the fund or its accumulations, and if, when called upon to account, he refuses so to do, or renders false and fictitious accounts, so defective as to be impossible of proper judicial investigation, in such case, if the amount of the fund which he has used can be ascertained, he may be charged with it, and the largest profits that can lawfully be made thereon by the most sagacious and expert business men, in their management of money, even to the allowing of compound interest at the highest lawful rates, and making rests annually or semi-annually, if it shall appear just and equitable to the court, in order to secure to the *cestui que trust* the profits of his property of which he has been deprived.

15. The law entitles the *cestui que trust* to all the accumulations of his property while in the trustee's hands; and under such circumstances as are mentioned in the preceding paragraph, when the trustee refuses to account, it will be presumed he has received such accumulations so estimated, and that such is the beneficiary's loss, and a court of equity will award it to him. Such an award is not for the purpose of punishing or imposing penalty on the trustee for his maladministration of the trust. Courts of equity do not impose or enforce penalties, or punish parties for their wrongs in the administrations of trusts, but only furnish adequate means of redress; beyond this they do not go, unless so directed by the law-making power.

16. On consideration of the circumstances of this case, it is found

that no laches are imputable to the representatives of the deceased partner in pressing their claims for an accounting against the surviving partner.

17. A surviving partner, who was also executor of the deceased partner, was guilty of gross fraud in the administration of his trust. He filed a false inventory in the probate court. He converted the entire assets of the firm, and most of the individual estate of the decedent, to his own use, and covered up his fraud by false entries in books, and by suppression and destruction of books, papers, and documents. He trafficked with the assets, and made large profits, though, on account of his manipulations of the books, the exact amount thereof cannot be ascertained. When the heir filed a bill against him for an accounting, he answered with a false and fraudulent statement, showing that nothing was due, and after the death of the heir substantially repeated these statements in his answer to a bill brought by the heir's widow and sole devisee. He persistently evaded and resisted judicial investigation in the probate court, and elsewhere, and died 15 years after his partner, in 1880, without having accounted. His administrator, after resisting for years all attempts to get at the true state of the firm's books in the probate court, filed a bill offering to account with the representatives of the deceased partner, but attached no account of his intestate's administration. A demurrer to his bill on this ground having been sustained by this Court, he presented accounts which are found to be false and fraudulent, and insufficient to be made the basis of an accounting, and unfit for judicial investigation.

*Held*, that no further accounting is necessary, and that the representatives of the deceased partner, after a contest of 24 years for their rights, are entitled to summary relief; and, it appearing that the interest of the latter in the firm at his death, in 1864, was at least $104,000, a decree is granted for that sum, with interest at 10 per cent. to the time of the trustee's death, in 1880, amounting to $262,715.55, and to this amount interest is added at 7 per cent. to the date of the decree, November 28, 1888, the whole amounting to $426,029.66, together with costs of both courts, and a counsel fee of $20,000.

18. In this case a relative of the fraudulent trustee, and who was made a party, claimed to have been a partner, and asked for an accounting. But it appeared that he contributed no capital to the firm, and that he was cognizant of and participated in most of the fraudulent devices by which the representatives of the deceased partner were sought to be defrauded.

*Held*, that the latter are not to be embarrassed by the vexa-

tion, expense, and delay in the determination of his rights, if any; that their claim is to be first paid, and the bill may be retained for such further proceedings as are necessary to adjudicate his claim, if he desires so to do, against the trustee's estate.

19. A surviving partner, who was executor of the deceased partner, was also tenant in common with him of certain mill property, and he assumed to be guardian of the decedent's only son. On the day the latter became of age, or about that time, the surviving partner entered into agreements with the heir, who was without any experience in the management of property, authorizing the former to make certain improvements on the tenant in common property, and to charge therefor certain gross sums mentioned therein. Other agreements of like nature were made shortly after. These all assumed that the interest of the deceased in the firm was worthless, and amounted to an assignment by the heir to the surviving partner of the rents and profits in consideration of making advances. In reality the firm had a large surplus, in which the interest of the deceased partner was over $100,000.

*Held*, that the agreements were fraudulent, and not binding upon the heir.

20. The testimony in this case was taken under an order directing proofs to be taken "relating to matters in controversy between the parties necessary or proper to be determined for the purpose of ascertaining and determining the principles upon which the accountings in this case, or any of them, should proceed." This order was liberally construed by all parties. Complainant, the representative of the surviving partner, undertook to state an account, and gave testimony on every item therein. Nearly 10,000 pages of testimony were taken, and it appeared that all the information that was obtainable was thus brought before the court.

*Held*, that notwithstanding the technical form of the order of reference, a final decree would be rendered, if in so doing justice between the parties could be attained.

21. A surviving partner was also executor of the last will and testament of the deceased, and tenant in common with his heir of certain mill property. After his death his administrator filed a bill offering to account with the representatives of the deceased partner as to the administration of the surviving partner in his capacity as such, and also as executor and tenant in common. There were controversies as to who were entitled to participate in the accounting on behalf of the deceased partner, as to who composed the firm, as to the genuineness of certain articles alleged to be in renewal of the

partnership, as to the legality of certain agreements made with the heir with reference to improvements on the tenant in common property, as to the *bona fides* and sufficiency of accounts attached to the bill, and as to the form of relief; the complainant claiming the right to account from such books and papers as remain on hand, and defendants claiming, on account of the trustee's fraud, summary relief, and a return of the deceased partner's capital, with compound interest. The court below made a decree fixing the principles of the accounting, in which all of these controversies were passed upon and decided.

*Held*, that such a decree was final and appealable; that it was a determination of substantial rights; and, under the practice in this State, the party whose rights are thus determined is entitled to a review in this Court of the proceedings by which it has been done. It is the effect, and not the form, of the order or decree, or the particular classification of the same, which determines the right to appeal.[1]

Appeal from Calhoun. (Hooker, J.) Argued February 28 and 29, and March 1 and 2, 1888. Decided November 28, 1888.

Bill filed for an accounting, etc. Complainant, and all the defendants except the Perrins appeal. Decree entered in this Court in accordance with opinion, in which the facts are stated.

*M. J. Smiley* (*J. A. Stull* and *Ashley Pond*, of counsel), for complainant, contended:

1. Compound interest will not be decreed as a punishment for misconduct, but only upon the theory and because it appears that the trustee has realized as much as compound interest amounts to, or that he ought to have received that much, or that the circumstances are such that he is estopped from saying that he did not receive that much; citing *Attorney General v. Alford*, DeGex, M. & G. 851.

2. It appears from a view of all the authorities that a distinction has been taken, as in every moral point of view there ought to be, between negligence and corruption in an executor. If he has balances which he ought to have laid out, either in

---

[1] Head-notes prepared by SHERWOOD, C. J.

compliance with the express directions of the will, or from his general duty even where the will is silent, yet if there be nothing more proved, in either case the omission to lay out money amounts to a case of negligence or of misfeasance; citing *Tebbs v. Carpenter*, 1 Madd. 162, and cases cited and reviewed by the vice-chancellor in that case.

3. As illustrating the American rule on this subject, counsel cited *Schieffelin v. Stewart*, 1 Johns. Ch. 610; *Manning v. Manning*, Id. 528; *Bryant v. Craig*, 12 Ala. 354; Perry, Trusts, §§ 468, 470; *Ins. Co. v. Lynch*, 11 Paige, 523; *Hazard v. Durant*, 14 R. I. 25; *Ames v. Scudder*, 11 Mo. App. 168; *Cruce v. Cruce*, 81 Mo. 676; *Hollister v. Bradley*, 11 N. H. 511; *Clarkson v. DePeyster*, Hopk. Ch. 424.

4. Can a court of equity in Michigan allow a sum for interest greater than the limit of the legal rate? Is it within its power, and if so can it be allowed except where the profits have been that much or more, and are proven to be so much? We submit that the court has no such jurisdiction.

5. When an election is allowed between profits and interest, the *cestui que trust* must take one or the other for the whole period and upon the whole capital; citing Hill, Trusts, 374; *Heathcote v. Hulme*, 1 Jac. & W. 122; Perry, Trusts, § 470; Lindley, Part. 1113

6. The trustee is entitled to commissions. As a general rule, and in the case of executors, their commissions being statutory, they are entitled to them as a matter of right, even in cases of misconduct in the management of their trusts, and even in cases where they have been charged compound interest; citing *King v. Talbot*, 40 N. Y. 96; *Vanderheyden v. Vanderheyden*, 2 Paige, 288; *Meacham v. Sternes*, 9 Id. 405; *Rapalge v. Norsworthy's Ex'rs*, 1 Sandf. Ch. 406; *Iddings v. Bruen*, 4 Id. 239, 268; *McWhorter v. Benson*, Hopk. Ch. 28.

7. So, in cases where profits are allowed, in taking the account the trustee or surviving partner by whose exertions they have been made is generally allowed compensation for his services; citing Lindley, Part. 984.

*Charles M. Swift* (with *Samuel T. Douglas* and *Wm. H. Porter*), for defendants Lepper and Fisk, contended, on the question of compound interest, as follows:

1. The Michigan cases establish two propositions:
   a—That compound interest is not allowed for mere neglect to invest, or for the intermingling of the trust fund with the private funds of the trustee where there has been no fraud

or overreaching, and where the fund has earned simple interest or less.

*b*—That where the trustee has been guilty of fraud, and where he has destroyed or concealed evidence, and where there is reason to believe that large profits have been earned, all presumptions will be against the trustee; profits will be fixed at a percentage or ratio which appears to be equitable according to the best lights the court can get, and compound interest will be allowed.

Compare *Moyer v. Fletcher*, 56 Mich. 508, and *Gott v. Culp*, 45 Id. 265, with *Heath v. Waters*, 40 Id. 457.

2. As showing the rule as stated by text-writers, counsel cited 2 Kent, Com. 231 (note); 2 Story, Eq. Jur. § 1277; Perry, Trusts, § 468, 471; 2 Pom. Eq. § 1075 (note), 1076.

3. As showing the English rule, counsel cited the following cases: *Raphael v. Boehm*, 11 Ves. 92; 13 Id. 407, 590; *Walker v. Woodward*, 1 Russ. 107; *Walrond v. Walrond*, 29 Beav. 586; *Jones v. Foxall*, 15 Id. 388; *Williams v. Powell*, Id. 461; *Saltmarsh v. Barrett*, 31 Beav. 349, 350; *Knott v. Cotte*, 16 Id. 77; *Ex parte Baker*, 18 Ves. 246.

4. The following American cases were cited: *Schieffelin v. Stewart*, 1 Johns. Ch. 620; *Diffenderffer v. Winder*, 3 Gill & J. (Md.) 311; *McKnight's Ex'rs v. Walsh*, 23 N. J. Eq. 136; *King v. Talbot*, 40 N. Y. 76; *Adair v. Brimmer*, 74 Id. 539; *Bowles v. Drayton*, 1 Desaus. Eq (S. C.) 489; *Walker v. Walker*, 9 Wall. 743; *Price v. Peterson*, 38 Ark. 494; *Eliott v. Sparrell*, 114 Mass. 404; *Jennison v. Hapgood*, 10 Pick. 77; *Ogden v. Larrabee*, 57 Ill. 389; *Moore's Ex'rs v. Beauchamp*, 5 Dana (Ky.), 70; *Berwick v. Halsey*, 4 Redfield (N. Y.), 18; *Lathrop v. Smalley's Ex'rs*, 23 N. J. Eq. 192; *Hook v. Payne*, 14 Wall. 252; *Gully v. Dunlap*, 24 Miss. 410; *Edmonds v. Crenshaw*, Harp. Eq. (S. C.) 224.

[The briefs in this case contain nearly 1,000 pages, and are, in the main, confined to a review of the facts as claimed by the respective parties, and of many of the cases cited, with quotations therefrom.—REPORTER.]

*Wm. D. Adams* (*John J. Speed,* of counsel), for Perrin defendants.

*Miner & Stace* (*Geo. H. Southworth,* of counsel), for defendants "The Sibley Heirs."

SHERWOOD, C. J.   Joseph Sibley, on October 11, 1858, resided in the city of Marshall.   He was a physician, and practiced his profession, and for the previous 18 years was also engaged in loaning money, buying notes and mortgages, and other securities.   His principal business was, however, at the time referred to, loaning money upon bonds and mortgages, and it is claimed by the defendants that he was then worth at least $200,000.   They further claim that he had but little knowledge of book-keeping, and less capacity still for understanding double entry.

At the date first mentioned he formed a copartnership with Horace J. Perrin, who then resided in the city of Marshall, where he had for 11 years previous carried on business, and at the time of the formation of the partnership was engaged in loaning money, dealing in lands, and carrying on a milling business, and at that time, it is claimed by complainant he was worth about $200,000.

Dr. Sibley was married, had one son, his only child, whose name was Francis M. Sibley.   Horace J. Perrin was a single man, and never married.

A short time previous to the formation of the copartnership with Dr. Sibley, Horace J. Perrin had been engaged in the banking business in New York, with a Mr. Gilbert, but with what success does not very clearly appear.   He had also had considerable dealings with his uncle, Darius Perrin, a banker of the city of Rochester, N. Y., who was then favorably and extensively known as a capitalist of large business experience.   When the partnership was formed, Sibley put into the firm as capital about the sum of $104,000 in securities, consisting mainly of good bonds and mortgages.   Just what amount of capital H. J. Perrin put into the firm it is very difficult to ascertain.   Complainant claims, however, a sum amounting at least to $123,000.

The articles of copartnership read as follows:

"Articles of copartnership made and entered into October 11, A. D. 1858, between Joseph Sibley of the first part and Horace J. Perrin of the second part, witnesseth:

"*First.* That the said parties hereby agree to enter into copartnership with each other for the purpose of carrying on the business of banking, and such other business as relates to the purchase and sale of exchange, buying, discounting, and advancing, upon paper or other securities, issuing certificates of deposit, and doing a general milling business, so far as the same can be done in running the custom mill on lot No. 4, in Marshall, which is hereby leased to said firm by the party of the second part, for and during the continuance of this copartnership, at an annual rent of two thousand dollars ($2,000) per year, paying quarterly, and the taxes on the same. The style or name of said firm shall be H. J. Perrin & Co., and the place of business, Marshall, Mich.

"*Second.* The said copartnership shall commence October 11, and continue for the space of three years, unless sooner dissolved by the death of one of the parties.

"*Third.* The capital to be invested as joint stock in the business shall be ——— dollars, of which the said Sibley, party of the first part, shall contribute and pay in, by transfer to the firm, in bonds and mortgages, notes and moneys, the sum of one hundred and three thousand eight hundred and six dollars and thirty-nine cents; and the said Perrin, party of the second part, shall in like manner pay in, by transfer of bonds and mortgages, notes and moneys, the sum of ———; each party to be credited and allowed annually, on the books of the company, such a rate of interest as such bonds and mortgages shall pay so transferred by him; and each for himself guarantying to the other, and to said firm, that the makers of each bond and mortgage, note, or other security so transferred by them to said company, shall pay as the same becomes due and payable, according to the terms of said papers, together with all costs of collection, including attorney's fee; but on any moneys not so invested, which shall be paid into said firm by either of us, the rate of interest shall be seven per cent. only per annum, and at the time of the dissolution of this copartnership he will receive back from said firm, as so much of his portion of the assets, any portion of such secureties so transferred by him as shall then remain unpaid.

"*Fourth.* The profits and losses of the company shall be shared and equally divided between the parties.

"*Fifth.* The said parties shall each give their time, and exert their skill and energies, to and for the best interests of the firm, so far as may be needful for the prosperity and success of the company's business.

72 MICH—30.

"*Sixth.* The name of this firm shall not be used by either of said parties without the written consent of the other, as indorser or security for others.

"*Seventh.* Neither party shall draw from the funds of the same a greater sum than one thousand dollars per year, on which he shall be charged seven per cent. per annum.

"*Eighth.* In case Darius Perrin, of Rochester, N. Y., shall consent to the use of his name as a joint partner with us under the articles of copartnership, sharing profits and losses equally with us, he is at liberty to do so at any time, in giving us notice in writing, and consenting to the use of his name

"*Ninth.* In case of the termination of this copartnership by the death of either party, the business of the firm shall be wound up and closed by the survivors as soon as may be, with reasonable and proper regard to the interest, and a true account rendered, and a settlement be made by the survivors as soon as practicable, with the legal representatives of the deceased.

"*Tenth.* Regular and accurate books of account shall be kept of all the transactions of the firm, to which both parties shall have free access.

"*Eleventh.* On the 1st day of January, April, July, and October of each year an account of stock shall be taken, and a balance shall be made showing the profits or losses for the past quarter.

"DARIUS PERRIN.

"H. J. PERRIN.

"J. SIBLEY."

The firm commenced business at once on the formation of the copartnership, and continued the same until the 30th day of April, 1859, when it is claimed by the complainant that Darius Perrin became a member of the firm of H. J. Perrin & Co., in pursuance of the eighth clause of the articles of copartnership; and that thereupon Horace J. Perrin and Joseph Sibley made the following instrument as evidence of such fact, viz.:

"Darius Perrin, of the city of Rochester, N. Y., having elected to become a copartner with Joseph Sibley and Horace J. Perrin, in pursuance of article 8 of the annexed articles of copartnership, now it is agreed that said Darius Perrin shall become such partner from and after the day of the date hereof, and that henceforward the name of said Darius Perrin may be used as a mem-

ber of said copartnership, and he shall from and after this time share in the profits and losses of the copartnership business as provided by said eighth article.

"H. J. PERRIN.
"J. SIBLEY.

"*Dated April 30, 1859.*"

This instrument appears attached to the articles of copartnership. It is conceded that Darius never put into said firm any capital whatever, and then, and ever since has, resided in the state of New York, at the city of Rochester. The defendants Lepper and Fisk deny that Darius Perrin was ever such partner as is claimed by complainant, and defendants the Sibley heirs also make the same denial. Darius Perrin admits and claims he was a partner, but Elizabeth and Caroline, his daughters, are silent upon the subject in their answers. Defendants Lepper and Fisk also deny the genuineness of the instrument admitting Darius into the firm, a copy of which appears above.

The partnership between Joseph Sibley and Horace J. Perrin continued until Sibley died, on September 7, 1864, and all the time did a large amount of business. By the terms of copartnership it would have expired on October 11, 1861. The term of its continuance was extended by Horace J. Perrin and Joseph Sibley for three years from the time of its expiration mentioned in the articles of copartnership. This extension was in writing, and was made July 31, 1861. The writing is claimed by complainant to be as follows:

"We hereby renew the articles of agreement or copartnership and company papers, and extend the term of our regular business, or articles of agreement, or copartnership, for three years from the time the same would expire, in 1861, on precisely the same terms. [All interest on each's capital and paper to be seven per cent. from 1858.]  H. J. PERRIN.
"*July* 31, 1861.  J. SIBLEY."

Defendants Lepper and Fisk admit that the firm was continued until Dr. Sibley died, but claim that the agreement under which the extension was made did not contain the clause quoted in brackets, and that said clause was fraudulently inserted at ·the end of said written extension by Horace J. Perrin ' after the same was made and signed.

The Sibley heirs say that they admit the copartnership existed, at the time Sibley died, between Horace J. Perrin and Joseph Sibley, but say nothing of the manner of its continuance.

Darius Perrin admits that the copartnership was extended three years by an instrument in writing, signed by Horace J. Perrin and Joseph Sibley, but denies upon his information and belief that such extension was by the above written agreement set forth, and says that the terms were in all respects precisely the same as those contained in the original articles of copartnership.

Before Joseph Sibley died he made a last will, and attached a codicil thereto. These instruments, or rather copies thereof, read as follows:

"KNOW ALL MEN BY THESE PRESENTS that I, Joseph Sibley, of the city of Marshall, county of Calhoun, and State of Michigan, being of sound mind and memory, do make, publish, and declare the following to be my last will and testament:

"*Firstly.* I will that all my just debts and funeral expenses be paid.

"*Secondly.* I give and bequeath to my beloved wife, Hannah, all my household goods and furniture, all my stock, farming tools, wagons, etc., and the use during her life-time of all the land, buildings, and tenements I own, at my decease, on section No. twenty-six (26), within the said city of Marshall; and also $20,000 at once, or $1,000 annually, at her election, during her life-time, to be paid out of my estate.

"*Thirdly.* I will, if it is not done during my life-time, that lot No. 207, group F, I own in the said city of Marshall cemetery, be inclosed with a suitable iron fence, and a suitable family monument erected therein, under the direction of my beloved wife,

should she be living, and, if not, under the direction of my beloved son, Frank.

"*Fourth.* I give and bequeath to my beloved son, Francis M. Sibley, when he arrives at the age of twenty-one years, $3,000, and $1,000 annually thereafter, until he arrives at the age of twenty-five years; and if at that time he shall have used what he has received, as above stated, in a judicious, frugal manner, and not wasted and squandered it (in the opinion of my executors hereunto appointed), he shall then receive $10,000 more; and if, at the age of thirty years, or sooner, if in the opinion. of my said executors he shall have managed, and will continue to do so, what he has already received, in a judicious, frugal manner, he shall receive $15,000 more; and if, at the age of thirty-five years, or sooner, if in the opinion of said executors he shall have, and will still continue to use what he has received, as before stated, in a frugal, economical, and judicious manner, he shall come into full possession of all my estate, personal and real, not otherwise disposed of by this will, or otherwise.

"But if, after having received $10,000 at the age of twenty-five years, he shall have squandered and wasted what he has already received, or in the opinion of said executors he will waste and squander what he receives, he shall thereafter receive but $1,000 annually, and all my estate, real and personal, not otherwise disposed of, shall go to the legal issue or children of my beloved son, Francis M. Sibley; but, in case he dies without said issue or children, then, in that case, it shall go to my legal heirs and representatives equally, according to law, except my beloved sister Roxana Collins, and her heirs, who shall receive only five dollars."

"*Lastly.* I give and bequeath to my beloved nephew James R. Sibley all the land I own in Fredonia, Calhoun county, Michigan, being the west fractional one-half of section number two (2), in said town of Fredonia, he, the said James R. Sibley, to pay to my estate for all stock and tools, and all other personal property that I have put on to said land, as per my books, at the end of ten years, with interest thereon annually.

"And I hereby appoint Manlius Mann, Horace J. Perrin, William Powell, Charles P. Dibble, and Joseph C. Frink as executors to carry out the foregoing will; and they are to have the control and direction of my beloved son, Frank, during his minority, and the above-named executors, a majority of them, are authorized to choose their own successors in office.      J. SIBLEY. [L. S.]

"Signed and sealed in the presence of
   "WILLIAM POWELL.
   "C. H. MANN.
   "HARRIET M. MANN.
   "E. CHURCH.

"MARSHALL, September 3, A. D. 1864.

"In addition to the foregoing will, I hereby give and bequeath to my beloved friend Wm. Powell, of Marshall, Calhoun county, Michigan, the sum of $1,000, compensation for looking after and assisting my family and their interest when I am gone, and I hereby declare this and foregoing to be my entire last will and testament.                                    JOSEPH SIBLEY. [L. S.]

"Signed and sealed in the presence of
    "MANLIUS MANN.
    "WM. H. HOLMES.
    "KITTIE E. MANN."

The date of the codicil appears to have been on the 3d day of September, 1864, but four days before the testator's death. There is nothing upon the other portions of the will showing its date, or when it was made and executed.

By the death of Sibley the copartnership was dissolved. During its existence, Sibley had unlimited confidence in the business ability and judgment of his partner, Horace J. Perrin, and he had but little to do with the management of the business of the firm. He trusted its management almost exclusively to Mr. Perrin. The firm had done during its existence a large amount of business of various kinds. Its ordinary or principal business was banking and loaning money on bonds and mortgages. It carried on its banking in Michigan, Illinois, and Wisconsin, and was the owner of six different banks, and a portion of the time had a branch office in the city of Chicago. It dealt largely in wheat and flour, and part of the time operated a large flouring-mill, besides a custommill, at Marshall, and carried on a feed-store in connection with the milling business. It was engaged in buying and selling real estate; dealt in stocks and state bonds; ran a paper-mill; carried on some farming operations; and dealt considerably in wool and western money. After the death of Joseph Sibley, and the dissolution of the firm of H. J. Perrin & Co., H. J. Perrin continued.

the business in which the firm had been engaged until he died, on the 11th day of January, 1880.

All the executors of the will appointed by Joseph Sibley declined to act as such, or in any manner discharge the trusts created by the will, except Horace J. Perrin, who, after the will had been duly probated, on the 7th day of October, 1864, accepted the trust, and he alone was duly appointed executor by the judge of probate of Calhoun county. At this time Francis M. Sibley, the only heir of Joseph Sibley, was but 19 years and 2 months old, and his mother, the widow of Joseph Sibley, was still living. It is stated in the record by both Horace and Darius Perrin that at the time of the decease of Joseph Sibley, and for six years previous thereto, Horace Perrin had been an intimate friend of Joseph Sibley, who "had the most implicit trust, reliance, and confidence in Horace J. Perrin," and that Joseph Sibley at that time—

"Had no confidence whatever in the integrity or discretion of his said son, Francis M. Sibley, but, on the contrary, well knew he was addicted to habits of extravagance, profligacy, and prodigality;"—

That he was a wild youth, of "spendthrift, profligate, prodigal, idle habits;" and his father frequently said that his son gave him the "greatest anxiety" on account of his habits, and in consequence of which he feared—

"And was apprehensive that he would waste and expend the whole of his patrimony as soon as the same should come into his hands."

As surviving partner, Horace J. Perrin had possession of all the property and assets of the firm of H. J. Perrin & Co., and all of the estate of Joseph Sibley, as executor of his will, after his appointment, and ever after, so long as he lived, managed and controlled and disposed of the same, whether such estate was individual, copartnership,

or tenant in common property. On the 21st day of January, 1865, he claimed to have made and filed an inventory of the Sibley estate, and appraisal thereof, from which it appears that the individual and tenant in common property belonging to the estate amounted to the sum of $67,592.04; and that the interest of the estate in the firm property of Horace J. Perrin & Co. was the sum of $10,533.81. Also, in connection with this inventory, the statement is made by Horace J. Perrin that nothing had been allowed for profits or losses in the business of the firm, but the losses, being over $75,000, would probably cover all profits of company business, with extraordinary success in collecting the old paper put in by Sibley as capital.

In the month of May, 1865, the commissioners upon the estate of Joseph Sibley made their report on claims, from which it appears they allowed against the estate, as indebtedness due from Sibley individually, $954.71, and claims against H. J. Perrin and J. Sibley and H. J. Perrin & Co. the sum of $110,679.33 against the estate. H. J. Perrin had charge of the business of the firm, controlled its business, and the conduct of the same, during the existence of the copartnership, and had two or three different clerks to assist him, but all were under his direction and dictation. He drafted very many of the business papers himself, and was regarded by those who knew him best as a sharp, selfish, grasping man, of a very high order of business ability, which was well developed in looking after his own interests. He was not exceedingly communicative about his business, but was remarkably discreet in making the most of opportunities when presented; and while he left the details of his transactions to his clerks, as directed by him, the business was always done by himself, and in such manner as to be little understood by others. His modes were not those of business

men generally, and while they may have been to him simple, and easily explained by him, they are shown to be by others almost past finding out. He had a way of placing the title to a large amount of his own and the firm property in relatives and friends, both in and out of the State, and of taking title to the property of others and of the firm to himself, and making no explanation of the transaction to those whose interest might be affected thereby, which can hardly be recognized, from what is known of these transactions, as fair dealings. He took upon himself trust relations, from the responsibilities of which others shrank, without any apparent con_ception of the duties they imposed upon him, or any recognition of many of the rights of his *cestuis que trust*.

"No regular or separate partnership books were kept" for the accounts of the firm, but the accounts were kept upon whatever books happened to be at hand, and the firm and individual accounts were mingled on the same set of books in such a manner as to lead to the greatest confusion and difficulty in understanding them. Indeed, no man has yet appeared who has been able to give a satisfactory explanation of them, not even the clerks who assisted in making them. No inventory or account of stock of the firm was taken at the time before the death of Joseph Sibley, and no inventory of the firm's property was ever made by Horace J. Perrin after Sibley's death.

Joseph Sibley was sick for more than a year, and was confined to his bed for six weeks previous to his death. He left a widow without business experience, who elected to take the money provision made for her in her husband's will. His son was a minor, of wild, dissolute habits, without business experience or business capacity, and it would appear that his father had but little expectation he ever would have. The men under whose protection this father, upon his dying-bed, had placed his

son by his will, had declined that charge, and he was left without the guardianship of any one whose special care and duty it was to look after him, or ·his estate, during his minority. It is true, Horace J. Perrin had qualified as sole executor of his father's estate. This, however, he should not have done. The position was incompatible with his relation to the estate of Joseph Sibley as sur· viving partner, and it is hardly to be presumed the testator would have thought to have conferred on Perrin alone the important trust relating to, his son, Francis, contained in the will, and which certainly vested in him none of the important discretionary powers, concerning the young man and his estate, which could only be exercised by all the persons appointed by the deceased to execute his will, or a majority of them.

During his minority, Francis was attending school at Rochester, and for a time was in Perrin's office, at Albany, where it is said he acted badly, and where he continued until he was of age. During his minority H. J. Perrin paid the specific legacies mentioned in the will and codicil, and made improvements on the tenant in common property, for which he claimed a liability against the Sibley estate to the amount of about $40,000. The entire estate of Joseph Sibley was at this time, of whatever character or kind, whether individual, tenant in common, or copartnership, with all the books, title deeds, and papers relating thereto, either in the possession of, or under the control of, H. J. Perrin, as surviving partner, executor, or trustee, and he claimed the right, under the discretionary power given in the will to all the persons named therein as executors, to dispose of the same, and judge of the qualifications, habits, and prospects of young Francis, and to determine the amount of the estate, if any, that should be paid to him accordingly, from time to time, thereafter.

This was about the situation of Francis and his inheritance at the time he became of age, on August 28, 1866. Knowing the friendship and great confidence and respect Joseph Sibley had for the business character and ability of Perrin, and the assurance his father had given him of this in the provisions he had made in his will, he undoubtedly became impressed with the same views on arriving at age, and was ready to adopt any business arrangements and schemes suggested by Perrin, and accommodate himself to any action Perrin might desire him to take relating to the property of the estate and its management; and before he left Albany, and, as the defendant Mrs. Fisk now claims, the next day after he became of age, but as complainant claims, about 14 days thereafter, he was visited by Mr. Perrin, who procured his signature to certain papers, reading as follows:

No. 1. "WHEREAS, My father, Joseph Sibley, late of the city of Marshall, Mich., deceased, died leaving a large amount of real estate in said city and vicinity, owned by him in common with, or as partner of, Horace J. Perrin, and Horace J. Perrin and Darius Perrin, which said property constituted his entire property, and more than his entire property after paying the legacies to my mother, James R. Sibley, and others; and

"WHEREAS, My said father left a will appointing said Horace J. Perrin and others executors thereof, and the said Horace J. Perrin has become sole executor of such will; and

"WHEREAS, A large portion of said real estate was at the time of the death of my said father, and some of it is still, comparatively unproductive, and the said Horace J. Perrin has at my request and urgent desire furnished and advanced means from his own resources, and has made certain improvements, and it is desirable that other and further improvements be made on said property so as to make it more productive, some of which said improvements made and contemplated are as follows, and for which the said Horace Perrin is to be paid, from the first moneys coming into his hands as such executor or joint tenant, and from the avails of any property of said estate, the following sums, to wit:

"That is to say, for furnishing materials and building dam across the Kalamazoo river, and building embankment on south side of same, the sum of $23,800; for building embankment on north side of river, and between race and river, the sum of $3,500; for building planing-mill, water-wheel, and shafting, $6,964; for building plaster-mill, building and putting in machinery in same, $6,884.96; for building floor to paper-mill, new foundation wall, water-wheel, and machinery now being put in, $9,600.

"And I also request the said Horace J. Perrin to go on and complete the Marshall House, and finish the same suitable for a female seminary building, as contemplated should be done by my said father, and to keep an account of the same, which shall be paid as aforsaid with the other said improvements; that is to say, the one-half of said expenses of so rebuilding and improving the same, although all of said improvements are being made at a time when the currency of the country is much below par, and labor and material more than double the price ever ruling before in this country, yet to keep the property in a paying manner, or to command tenants at all, I consider it important it should be done and completed at as early a day as practicable:

"Now, therefore, in consideration of the premises, I hereby ratify and confirm all the acts and doings of the said Horace J. Perrin in the premises, and in the making of said improvements as aforesaid, and in the making of such improvements on, or as has been made on, any of the real estate so owned as aforesaid; and I hereby consent and request the said Horace J. Perrin to go on and make such other improvements on any of said real estate as he shall deem advantageous to the owners thereof, and that he take out of, or charge to, the estate of my father the due proportion thereof,—that is, of the expenses of any and all such improvements so made, or to be made,—which said sum shall be paid to him, with annual interest, and he shall retain possession of said lands and property till paid for such expenditures.

In witness whereof I have hereunto set my hand and seal this 29th day of August, September 14th, in the year of our Lord one thousand eight hundred and sixty-six.

"D. E. AIKIN.                              F. M. SIBLEY.
"W. H. PARDEE.
"Alteration of date done before signing."

No. 2 is as follows:

"I agree to go on and make and finish the improvements on the property as mentioned in the within or annexed paper between me and F. M. Sibley, and I hereby assign, transfer, and set over to Darius Perrin the leases of, and use and possession of, all said property mentioned in said paper so executed between me and the said Sibley, dated Sept. 14, 1866, till the receipt from which property shall pay the said Darius the sum of $31,000, or until the said sum is paid, and interest from this date, and all taxes assessed on said property from this date.

"*September* 14, 1866.                    H. J. PERRIN.

"F. M. SIBLEY."

No. 3 reads:

"For a valuable consideration, I, F. M. Sibley, do hereby join in and consent to the above assignment and disposition of the within-described property.

"*Dated September* 14, 1866.                 F. M. SIBLEY."

This paper was annexed to the other.

No. 4 is without date, and says:

"H. J. PERRIN:

"In addition to putting in bolts in custom-mill on lot 4, Marshall, which said last-mentioned repairs have cost $2,550 (twenty-five hundred and fifty dollars), you may and are hereby requested to put in smutter and buckwheat bolt, to cost not exceeding seven hundred and fifty ($750) dollars, one-half of which you may charge estate of Joseph Sibley, deceased.                    F. M. SIBLEY."

No. 5 relates to rebuilding the company's flouring-mill on the tenant in common property, and is in the following language:

"JANUARY 30, 1867.

"I hereby authorize and request H. J. Perrin to rebuild the stone mill on lot one, in the city of Marshall; that is, the upright part, leaving off the office and feed-room (said mill was burned on the morning of the 14th instant), at a cost of thirty-six thousand dollars ($36,000). He, the said Perrin, to use insurance on old mill first, and, for the balance of my own ($\frac{1}{2}$) half of the expense of

rebuilding said mill, I authorize him to use any money ana means belonging to the estate of Joseph Sibley, aeceased, that may be in his hands from the effects of said estate.                                    F. M. SIBLEY.

" In pursuance of the above, I agree to rebuild the upright part of said mill for the sum of $36,000; that is, the walls to be used as they stand, and I am to have all the old material.                          H. J. PERRIN.
                                              " F. M. SIBLEY."

It is claimed by defendants this sum was much more than the work cost Perrin, and more than it was worth.

No. 6, and last, of these papers, to which the young man's signature was obtained by Perrin, is as follows:

" The price of building the stone mill office of stone is agreed on at $1,196.34.    The price of building wheat-house at stone mill is $2,396.78, one-half of which is to be charged by said Perrin to the J. Sibley estate, and paid out of the first moneys received from said estate to the said H. J. Perrin.                        F. M. SIBLEY.
" Marshall, July 27, '67."

These several agreements, it will be noticed, obtained from Francis by Perrin, disposed of about $40,000 of his father's estate in making improvements upon the tenant in common property, at the instance of Mr. Perrin, during the first year after the young man became of age, and without his yet really knowing in what the estate consisted, its situation or extent, and which was, in less than five years thereafter, completely destroyed by fire. At this time H. J. Perrin had not yet paid Francis the first installment of his legacy, which he should have received when he became of age.    He was informed by Perrin that the exact affairs of the firm of H. J. Perrin & Co. could not be ascertained, but that the estate of Joseph Sibley was largely indebted to him, and when he died said estate did not exceed the sum of $75,000, and that was subject to large incumbrances, and that the firm of H. J. Perrin & Co. did not owe the estate of Joseph Sibley anything.

Francis, being unable, as he claimed, to obtain any accounting of his father's estate by Perrin, or of the state of the firm matters, or get access to the books and papers relating thereto, or money from said Perrin, on September 4, 1868, filed his bill of complaint in the circuit court for the county of Calhoun, in chancery, against the said Horace J. Perrin and Darius Perrin, for discovery of the true relation Darius Perrin sustained to the firm business of H. J. Perrin & Co., the character of that business, and where and to what extent it was carried on; the losses and profits thereof; what amount of property the firm owned, and in what it consisted, and where situated, at the time of the death of Joseph Sibley, and what amount belonged to him, and what was afterwards done with the same; and prayed that H. J. Perrin might set forth a true statement of all the property of the firm, and its income since the death of Joseph Sibley, and make a true statement of the individual estate of Joseph Sibley, and his doings therewith, and management thereof, as executor of the will of Joseph Sibley, and come to a correct and proper accounting with him, said Francis, for the estate and proceeds thereof left to him by his father, and that he might be placed in possession thereof.

The bill also alleged, after stating the death, of Joseph Sibley, and the acceptance of the executorship of the estate by Horace J. Perrin, and that he was in possession thereof, as executor, tenant in common, or surviving partner, that Joseph Sibley's estate was at the time of his death of the value of $250,000, and that said Horace J. Perrin had neglected and refused to render a true, just, and full statement of the affairs and condition of the property of said firm to him, or to give him any information satisfactory on the subject; that Perrin had all the books and papers relating to the firm's business in his possession, and refused to let him see them, or have

access thereto, or any person in his behalf; that he did not believe he intended to render a just and true account of the business of said firm, or disclose what sum was due to the estate, but designed, with the co-operation of Darius, to retain said estate to his own use, and appropriate the same, and defraud Francis out of his inheritance left to him by his father; that he was then using for his own individual gain the property belonging to the estate.

The bill further avers that all debts due and owing by the estate had been paid, and all special legacies except his own, and that he was informed and believed he was then entitled to receive and come into possession of the balance of the estate of Joseph Sibley, deceased, and that the property involved in the litigation was $75,000.

H. J. Perrin, in his answer, among other things, averred that he could not tell the exact condition of the firm property, but that there was nothing due to Sibley's estate from the firm, and that the same was indebted to him in the sum of $20,000, and that the firm was insolvent.

After the issue was joined, on motion of H. J. Perrin, the case was transferred to the Kalamazoo circuit, when it abated by the death of Francis.

Francis married Anna L. Montgomery, October 20, 1869, made a will, November 26, 1870, and died the 30th of the same month. By his will he gave to his wife all his property, and made her the sole executrix of his will. The will was duly admitted to probate, December 30, 1870, and letters testamentary were duly granted to his wife, Mrs. Anna Louisa Sibley.

Previous to Francis' death, Perrin had refused to let him have his annuity of $1,000 per year, or the $10,000, as provided in the will, when he should arrive at the age of 25 years. Perrin had never yet rendered any account

of his doings, and the condition and situation of the Sibley estate, which was now all in his possession; and Francis had died without getting any useful information in relation thereto, and at which time he claimed to be in poverty, while he was really the owner of over $100,000, which he insisted was fraudulently withheld from him, under circumstances most distressing, and in violation of a sacred trust conferred in confidence upon the executors by his father to look after his welfare, and protect and preserve his fortune, and to be so used, in any event, as to minister to his wants, comfort, and necessities; and that H. J. Perrin had assumed the duties of sole executor of his father's will to complete a scheme of fraud, already entered upon, to obtain and absorb the entire estate of Joseph Sibley, both individual and copartnership.

It was under such circumstances that the wife of Francis, now his widow, under the will of her husband, asked of the executor of Joseph Sibley's estate for what had been left to her, and was informed by H. J. Perrin, as such executor, that he did not recognize her rights; that she was not entitled to anything, and that the estate of Joseph Sibley, and the firm to which it belonged, were insolvent; and that he at the same time was prosecuting a claim, before commissioners on the estate of Francis, for making repairs on the estate property for about $17,000; and it appears an appeal by him from the disallowance of such claim by the commissioners, and which was presented in 1871, is now pending in the circuit court for the county of Calhoun.

What was known as the "Tillotson Mill Property," and owned, as Mrs. Sibley supposed, by the Sibley estate, was at this time about to be sold upon the foreclosure of a mortgage that was claimed to be paid. For the purpose

of preventing this alleged fraud. Mrs Sibley filed a bill in the Calhoun circuit, in chancery, against Perrin and the assignee of the mortgage, to obtain a decree setting aside the proceedings, and the deed obtained thereunder. This suit was, after issue joined, on motion of Perrin, transferred to the Kent circuit, and no further proceedings were had therein.

The bill filed by Francis had now been removed into the Kalamazoo circuit, and Mrs. Sibley's bill to the Kent circuit; and nothing more coming of them, Mrs. Sibley, on April 26, 1872, filed her bill in the Calhoun circuit, setting out the circumstances and situation of the estate. of Joseph Sibley, and that of her husband, Francis, as she was informed, and embodying therein the substance of Francis' bill. This bill was filed against H. J. Perrin, Darius Perrin, and such of the Sibley heirs as were then made known to Mrs. Sibley, and in which she complained seriously of the treatment of Horace J. Perrin in regard to the estate, and his refusal to give her any information concerning the affairs thereof, or to allow her such inspection and examination of the books and papers relating thereto as was necessary to a correct understanding of the business of the estate of Joseph Sibley; and prayed for a construction of the fourth clause of Joseph Sibley's will, and that H. J. Perrin might disclose the situation of the firm, and its property, assets, and accumulations, and the extent of the interest of his estate therein, and that the usual partnership accounting might be taken; that a receiver might be appointed to take charge of the partnership property; and, in the meantime, that an injunction might be granted to prevent Perrin from further meddling with the estate.

The mill property having burned down, upon which . there was an insurance of about $30,000, Mrs. Sibley filed

a supplemental bill to obtain a part of the insurance. The injunction asked was granted, and afterwards, on application to a circuit court commissioner, was dissolved, upon the ground that the estate of J. Sibley belonged to his collateral heirs, and not to Mrs. Sibley. Both Horace and Darius made answer to Mrs. Sibley's bill, and a few days thereafter obtained a transfer of the cause to the Jackson circuit.

On October 2, 1872, Mrs. Sibley gave H. J. Perrin the following notice:

"MARSHALL, MICH., October 11, 1872.
"HORACE J. PERRIN:
"You are now formally notified, as you have been verbally notified heretofore, that I refuse assent to any expenditures by way of improvements or repairs being made upon any of the property in which Joseph Sibley, at the time of his decease, was jointly interested with yourself, or with yourself and any other person or persons, either as tenant in common, partner, or otherwise, and in which I claim to be interested in the manner and to the extent set forth in the bill in chancery filed in the circuit court for the county of Calhoun, in chancery, in a cause in which I am complainant, and yourself and others are defendants, and recently ordered to be transferred to the circuit court for Jackson county, in chancery, by William D. Adams, circuit court commissioner.
"ANNA LOUISA SIBLEY."

Failing to get the desired information in relation to the estate of Joseph Sibley, from the Perrins, after waiting several months, Mrs. Sibley sought to obtain the same through the probate court, who, it appears, had, upon its own motion, ordered Perrin to file an account as executor of Joseph Sibley's estate, and for hearing thereon on the 2d day of December, 1873.

A short time before this, H. J. Perrin called upon Judge Douglass, and desired him to wholly withdraw from the prosecution of Mrs. Sibley's claim, and offered to compensate him liberally if he would do so, which, of course, was indignantly declined by that able and distinguished counsel.

In February, 1874, Mrs. Sibley filed her petition in
probate court for an order requiring Perrin to verify, in
a proper manner, the executor's account he had rendered,
and also to render an account as surviving partner. The
Sibley heirs filed their petition about the same time,
making a similar request. Answer of Perrin was filed to
these petitions, and on the hearing H. J. Perrin was
examined as a witness, and a large portion of that exam-
ination is made an exhibit in this case. It was in this
examination that Mrs. Fisk and her counsel were allowed
for the first time to inspect the paper, or knew of the
same, dated April 30, 1859. At this stage of the mat-
ter these proceedings were arrested by an injunction
obtained *ex parte*, in the case transferred to the Jackson
circuit, restraining the probate court from further pro-
ceedings upon these petitions.

Up to this time Mrs. Fisk claims she had not been
allowed to inspect the copartnership books and papers of
H. J. Perrin & Co.; neither was her counsel allowed to
do so; that from this time until 1880 she had become so
impoverished as to be unable to prosecute her claim to
the Sibley estate until after H. J. Perrin died, January
11, 1880. Pending these probate proceedings, H. J.
Perrin wrote Darius a letter, a part of which is as follows.
(Darius was then at Rochester, N. Y.):

"Dickey [meaning the probate judge] has made an
order to show cause in writing, 17th, why my account
should not be allowed. Now, I guess I will turn com-
pany matters over to you, as survivor. Can you handle
books best here or there, and have you a right to take
books out of the state? Powell has written them up, except
interest, which I don't know about until settled. Please
see what right survivors out of the state have."

He also wrote Darius, April 9, 1874:

"*Dear Darius:* As my health is, I may wish to turn
over the books of H. J. Perrin & Co. to you, as

surviving partner, to settle. You, no doubt, can do the
most of it through Mr. Powell, and it may be well for
you to write to him through me, with this inclosed to
me, authorizing him to act in your absence, to take
books and papers, and put in your safe, etc.

"Yours truly,
"H. J. PERRIN."

Powell had been cashier of the company's bank at
Marshall, and was Perrin's clerk, and had been in his
employ many years. Before H. J. Perrin's death, Mrs.
Hannah Sibley had died, and Mrs. Francis Sibley had
married Mr. Fisk, whose wife she now is. During the
suspension of her proceedings, on account of want of
means, she made the necessary arrangements with her
attorneys and others for the further prosecution of her
claim to the Sibley estate.

After the death of Horace J. Perrin, and on June 20,
1880, his brother, Joel J. Perrin, who had been with him
a considerable time during his sickness, and knew more of
his business than any one else living, probably, was
appointed administrator of H. J. Perrin's estate; and, on
the 18th day of February previous, defendant Lepper was
appointed executor of the unadministered estate of Joseph
Sibley. Soon after Mr. Lepper's appointment, he, as
administrator of J. Sibley's estate, brought suit against
Mrs. Fisk and the Sibley heirs, for the purpose of having
their right to the estate settled under the will. The suit
was, however, soon abandoned, because of a delay caused
by the attempt to ascertain who were the Sibley heirs, and
bringing them in by publication.

For the purpose of securing a judicial determination of
this question, however, as preliminary to the recovery
of the Sibley interest, Mrs. Fisk brought her suit in eject-
ment against the Rock River Paper-mill Company for an
undivided half of the paper-mill property, which H. J.
Perrin had leased to the company as executor, and which

he could not legally do. The company defended, and the cause was tried in the Calhoun circuit, and resulted in a verdict and judgment for Mrs. Fisk. The Sibley heirs, though not defendants upon the record, removed the cause into the Supreme Court, where at the October term, in 1881, Mrs. Fisk again prevailed. In this case, the Court gave a construction to the fourth clause of the will, holding that, after the decease of Francis M. Sibley, his widow was entitled to all the estate not specifically devised in the will of Joseph Sibley. See *Rock River Paper Co. v. Fisk,* 47 Mich. 212 (10 N. W. Rep. 344).

We have seen nothing in the briefs of counsel in this case, nor heard anything upon the argument, leading us to any different conclusion from the one expressed in that case. It is claimed, however, that the Sibley heirs were not parties to that suit, and are not, therefore, concluded by the decision; that under the pleadings in this case their rights cannot be adjudicated. It is immaterial whether the Sibley heirs are affected or not by our former decision. The pleadings in this case make them all parties, and all have appeared and answered the bill filed. These pleadings show that they claim the Joseph Sibley estate, and that they have a right to be heard upon the administrator's accounting, and deny that Mrs. Fisk has any rights in said estate under the will. Their rights, if they have any at all, are under the will; and the question they raise is a legal one entirely, upon the construction of the fourth clause, and is properly raised in this case. It may as well be decided herein, upon this reference, as upon an application for distribution. Mr. Lepper and Mrs. Fisk, the one as representative, and the other as representative and legatee, desire to have the question thus raised by the Sibley heirs settled.

The will of Joseph Sibley was duly probated, and no appeal from such probate has ever been taken by any one.

The will vested the entire estate of Joseph Sibley, both real and personal, upon his death, in his son, subject to the rights of the widow therein; and by the will he was only excluded from the use, possession, and enjoyment thereof, for a time, upon certain conditions, which never did, and now never can, happen.   It was not necessary that Francis should have the possession and control of the property belonging to Joseph Sibley's estate before he could convey or devise it to his wife.   There is no doubt, in our minds, but that it was the intention of Joseph Sibley, by his will, to vest in his son, subject to the provisions made for his widow and the other specific bequests, all his estate, both real and personal, on his death; and the possession and control of the same were only withheld, under the conditions therein named, that the young man might have sufficient time to acquire the knowledge and experience necessary to qualify him for the duties such possession and control, and their proper discharge, imposed.

There is no question, we think, but that Francis M. Sibley was seized of all the real estate, and held the title to all the property belonging to the estate of Joseph Sibley, aside from the specific bequests, at the time Francis died; and that the title to the same, with his rights therein, passed to Mrs. Fisk under his will; and that the collateral heirs of Joseph Sibley have no interest therein.

Much difficulty was complained of by all the persons interested in the Sibley estate, and who sought to ascertain its condition, and the affairs of the firm of H. J. Perrin & Co., in getting at the books and papers belonging to the estate and the firm.   It was alleged by all of them that they were withheld by H. J. Perrin, and under various pretenses they were not allowed access to them in his life-time, and after his death the same embarrassments are complained of under the administration of Joel

J. Perrin, who claims to have acted under advice of counsel in what he did, and the interpretation he gave to the court's orders.

On December 21, 1880, Mr. Lepper served upon Joel J. Perrin, as administrator of the estate of Horace, the following demand:

"To JOEL J. PERRIN,

"Administrator of the Estate of Horace J. Perrin, Deceased.

"*Dear Sir:* As administrator with the will annexed of Joseph Sibley's estate not already administered, I hereby demand of you that you forthwith account for and deliver to me all the unadministered assets of said last-mentioned estate, of which said estate your intestate, Horace J. Perrin, was executor at the time of his decease; said unadministered estate being claimed to include all assets not actually placed in the hands of the creditors, legatees, or distributees, etc., to whom they belong.

"I also demand of you that you deliver to me, as administrator as aforesaid, or deposit with the probate court of Calhoun county for my inspection, all deeds, bonds, conveyances, contracts, or other writings, including books of accounts, and especially the copartnership books of the former firm of H. J. Perrin & Co., in your possession, or within your knowledge, which contain evidence of, or tend to disclose the right, title, interest, or claim of, the estate of said Joseph Sibley, deceased, or of his estate, to any real or personal estate, or any claim or demand.

"S. V. R. LEPPER,

"Administrator as Aforesaid."

This demand was not complied with; and on December 24 he filed in the probate court a petition, praying that J. J. Perrin, administrator, might be ordered to deposit with that court all the books, papers, and documents in his possession or control, relating to the property and assets of the Sibley estate, or the copartnership of H. J. Perrin & Co., and H. J. Perrin's dealings with the same; and that he render just and true accounts, duly verified by him, of Horace J. Perrin's administration of the Sibley estate, including his acts and doings as the surviving partner of the firm. J. J. Perrin was cited to show cause why the prayer of the petition should not be granted, and on March 22 filed an answer. Pending this petition,

J. J. Perrin was examined on oath on several different occasions touching the matters contained in the petition, but only part of the books were obtained; Perrin claiming he could not find some of them. On February 8, 1881, he disclosed the fact that Perrin had private books at the house where he died, and claimed they were H. J. Perrin's private account-books relating to the business.

On February 23, and after this disclosure, J. J. Perrin filed the original bill in this cause, and on the same day stated the books at H. J. Perrin's house consisted of journals and ledgers; that they contained an executor's account; and, in his answer to Lepper's petition, urged that Lepper has had full access to all the books and papers respecting the property and assets of the firm of H. J. Perrin & Co., or of H. J. Perrin's dealings with the same; and denied the jurisdiction of the probate court to grant the relief prayed, and denied the power of the court to compel him to produce the books of the National Bank of Michigan, or the private books of H. J. Perrin, or the books not specifically mentioned in the petition of Mr. Lepper; also sets forth the pending of the original bill in this case. After a hearing upon these petitions, the probate court granted the relief prayed in the main. From this order J. J. Perrin appealed to the circuit court, in which, on the 23d day of December, A. D. 1881, the order of the probate court was substantially affirmed, except that the books and papers were to be examined and remain at the National Bank of Michigan, and that the account need not be on oath. This order was complied with only in part by J. J. Perrin. Mr. Lepper made demand for full compliance, and, on being refused, asked that Perrin show cause why he should not be punished for contempt, on refusal to produce the books and papers demanded by Lepper; but, before the hearing on this citation was had, Perrin removed the dis-

covery order into this Court for review upon *certiorari*, and obtained a stay of the contempt proceedings. On October 11, 1882, this Court affirmed the order as modified by the circuit judge; holding that the probate judge had jurisdiction in the matters. See *Perrin v. Judge*, 49 Mich. 345 (13 N. W. Rep. 767).

The defendant Mrs. Fisk had demurred to the original bill in this case, on the ground that it did not state the account of H. J. Perrin's administration of Joseph Sibley's estate. The question of jurisdiction was also raised, and the necessity to make the Sibley heirs parties. Lepper filed a plea, in which he urged the pending of his petition, and the proceedings thereunder, in probate court. The matter of these pleadings was heard in the circuit, on February 21, 1882, in which a decree was made by the circuit judge, sustaining both the demurrer and plea, and dismissing the bill, although he held the Sibley heirs were not necessary parties; this Court having previously held they had no interest in the Sibley estate in the *Case of the Rock River Paper Co.* Perrin appealed from this decree to this Court, which affirmed the decree at the circuit, except that it allowed the suit to stand, and Perrin to amend his bill, if he desired so to do. This Court held the probate proceedings did not prevent this suit in equity, if otherwise proper. See *Perrin v. Lepper*, 49 Mich. 347 (13 N. W. Rep. 768). A long struggle then ensued between the complainant and Lepper and Fisk and their counsel, in the efforts of the latter to obtain access to the books of the firm, and such books and papers as showed H. J. Perrin's management of the Sibley estate, individual, partnership, and tenant in common. These efforts were made under the several orders of the judge of probate, and, owing to the construction given to them by Joel J. Perrin and his counsel, the investigation became very perplexing and tedious, and procrastinated

the proceedings to an intolerable extent. It not only necessitated the employment of lawyers, but expert accountants, to make the examination.

This was not the treatment the heir or representative of the interest of a deceased partner, looking after his or her interest in the firm estate, should receive from a survivor, or his representative, possessed of all the property, and with all the books and papers relating thereto. Such treatment was a serious charge to bring against a trustee, who, on being asked simply to account for the trust property committed to his charge, and pay it over to the owner when the trust had expired, refused so to do, and such a course is looked upon with abhorrence in a court of equity. Even as between tenants in common, their interests require the utmost fairness on the part of a survivor. These books and papers were the common property of these parties, and about the only sources of information left to the defendants; and after examining and studying such as they could find in the public records, and such as they were permitted to examine, for weeks and months, with such book-keepers, assistants, and accountants as they could procure, and frequently traveling hundreds of miles in pursuing transactions partially disclosed by the books, sometimes with success, and as often without any satisfactory results, with such information as the defendants could obtain from the only parties who could give any, and who were inimical to their interest, and often led astray by them, defendants Lepper and Fisk made, on January 11, 1884, their answer to the complainant's bill, which had been filed January 30, 1883, by complainant. The answer contains 189 printed pages in the record, in 203 paragraphs. The contents of these pleadings, or even a full synopsis of them, will not be attempted in this opinion. We shall content ourselves with such references thereto only as may be necessary to

a correct understanding of the views we have taken, and the conclusions we have reached in this case. The amended bill contains, with the schedules, 307 pages.

The complainant, as administrator, in his bill gives what purports to be a full account of the formation of the partnership of H. J. Perrin & Co., and its dealings and business while it was in existence. Schedule A, attached, presents a showing, as complainant claims, of the ledger balances, assets and liabilities of the firm on September 8, 1864, and the disposition made of them by the surviving partner (complainant still claiming that Darius Perrin was a member of the firm). Schedule B is a statement of the indebtedness of the firm when Joseph Sibley died. Schedule C is given as accounts of H. J. Perrin as surviving partner, from September 8, 1864, to January 11, 1880, with fourteen pages of explanations; the latter containing the assignment and transfer to the bank of Michigan of $137,187.11, in mortgages owned by the firm, which guaranteed the payment of the same to the bank when matured. Said assignment is made by—

"H. J. Perrin & Co., owner in fact, as per their company books:" "H. J. Perrin, executor of J. Sibley, deceased:" "Darius Perrin, by H. J. Perrin, atty. of record:" "H. J. Perrin, survivor of himself and J. Sibley, deceased;" "Darius Perrin, for self and surviving partner."

This assignment is claimed to be void by defendants.

The bill states that six parcels of real estate belonged to the firm at the time of Sibley's death; that all but one of these have been so managed by H. J. Perrin, that the titles of the same are now held by relatives of H. J. Perrin,—the title to one parcel being in H. J. Perrin and Joseph Sibley; and some of those in whom the titles have been so placed now claim to be owners of the land, and propose to contest the firm's right to the same. Complainant claims that those holding the titles have

paid no consideration therefor, and the firm estate is the equitable owner thereof.

The bill further states that about $104,000 was the capital put into the firm by Sibley, and that Schedule E shows in what it consisted; that Perrin put in as capital about $123,000, and, at the time of Sibley's death, it amounted to about $189,000, but it is not stated in the bill, or in any schedule, in what it consisted; that the capital of Joseph Sibley shrank $7,000. by reason of failure to collect the securities; that it was further lessened by his purchase of real estate to the amount of about $70,000 shortly after the firm was organized, and that by reason of the amounts withdrawn, and the losses sustained by the firm, Sibley's interest therein at the time of. his death amounted to nothing, as complainant is informed and believes, and that such proved to be the case upon payment of the debts of the firm, and closing up its business; that some of the business done by the firm was profitable, and some was not; that when Sibley died, the indebtedness of the firm, including the capital put in by the partners, was $700,000, as near as complainant could ascertain the same from the books, and that Schedule A contains a statement of the indebtedness, and of the liabilities, and Schedule B of the gross indebtedness; and that Schedule C contains, with the explanations, as full and complete a statement as he is able to make of the transactions of Horace J. Perrin as surviving partner; that Schedule D is taken from the books kept by Horace, and shows the balances as surviving partner up to the time of his death; that Schedule F is a statement of the liabilities of the firm paid by Horace after Sibley's death, and also the moneys received from the assets of the firm, as near as complainant can make the same, and in effect contains a full statement of the result of his administration of the affairs of the firm; and complainant further

says that said schedules have been made upon a thorough examination of all the books and documents in his possession relating to the affairs of the firm, aided by expert accountants and book-keepers, who were familiar to a great extent with the affairs of the firm; and he believes the schedules are correct, and asks that all the schedules may be taken as part of his bill.

Complainant further says that the assets of the firm, without stating their value, consisted of the real estate hereinbefore referred to, and that the liabilities were $92,045.77 at the time Horace J. Perrin died; that of all such indebtedness was to H. J. Perrin, less $2,439.56, which was owing to Joseph Sibley's estate; and further says that said firm sustained large losses while doing business, and that upon closing up the same there were no profits remaining to be distributed; and that Horace J. Perrin, in order to pay the liabilities, had to pay large amounts of money from his own means, and for which said firm is now indebted to his estate.

Complainant further says he is informed Darius has the $12,000 mortgage given by Elizabeth C. Perrin to the firm, and that the same is subject to his control, and other mortgages and choses in action which belong to the estate, and that a receiver ought to be appointed to take possession of the real estate mentioned, as the assets of the firm, and collect the rents and profits thereof, to be disposed of as the court may direct.

The bill then sets forth at some length the tenant in common property, claiming the mill property on the Kalamazoo river, in the city of Marshall, and lot 521 adjoining the same as part therof, and the improvements made to the same, and mills thereon, hereinbefore described, by H. J. Perrin, and the several agreements of Francis M. Sibley relating thereto, numbered from 1 to 6, as heretofore given; and avers that young Sibley, as

heir of his father, had authority, notwithstanding anything contained in Joseph Sibley's will, to bind the estate for one-half the expense, as agreed upon, of said improvements, mentioned in said papers, and in pursuance thereof H. J. Perrin made the same, and that, under the assignment to Darius Perrin in No. 2, Darius received a large amount of rents and profits, and of which Schedule H is a correct statement, and that the same were disposed of as contained in said schedule; that the leases assigned to Darius were of the stone flouring-mill to July 9, 1872, and claimed to have been discounted by Darius at the sum of $10,657.03; lease of the custom-mill to August 21, 1871, at the sum of $4,037.08; lease of paper mill to February 15, 1872, at $5,909.60; lease of machine-shop to August 21, 1871, at $2,953.15; lease of planing-mill to October 1, 1871, at $2,126.28.

That after the burning of the stone mill, in January, 1867, and in 1872, said stone mill, custom-mill, and plaster-mill, and many other buildings on said property were all destroyed by fire, at a great loss to the owners, and rendered the water-power comparatively useless without them: that Horace acted in regard to the use and improvements of said property, until Francis became of age, upon his own judgment, and after that, in conjunction with him, who concurred in all that was done; and complainant claims that Horace's estate is entitled to be re-imbursed from the Sibley estate for one-half of such improvements, and for caring for the property; and that Exhibit G is a complete statement and account of H. J. Perrin, with all the tenant in common property at the time of Sibley's death, including the Marshall House property, down to May, 1869, since which time the accounts with said property have been kept with the executor's accounts of Horace J. Perrin, which is found in Schedule I attached to the bill.

And complainant avers that the amount due the Perrin estate upon said tenant in common property from the estate of Joseph Sibley is about $35,000, and he is unable to settle the estate of H. J. Perrin, as administrator thereof, until the tenant in common accounts have been adjusted: that H. J. Perrin received letters testamentary in the estate of Joseph Sibley on the 7th day of October, 1864; that from time to time after his appointment he filed his accounts as executor with the probate court of Calhoun county, but none have ever been allowed or passed upon by that court; that Schedule J, annexed to the bill, is a statement of the ledger balances on the books of H. J. Perrin, as executor until Perrin died. Complainant prays:

1. That a receiver may be appointed to take possession and charge of, and receive the rents and profits of, the firm's real estate before mentioned.

2. That the usual partnership accounts may be taken in respect to the affairs of the firm of H. J. Perrin & Co. from its commencement, and the share or interest of each of the parties thereto ascertained.

3. That the partnership real estate mentioned be decreed to be assets belonging to the firm, and that the same may be sold, and the proceeds distributed to whomsoever they belong, as shall appear upon the accounting.

"4. That it may be decreed that said Francis M. Sibley had full power to and did bind the estate of said Joseph Sibley and of Francis M. Sibley, by the said several instruments in writing, designated in this bill as Nos. 1, 2, 3, 4, 5, 6, and that an account may be taken of the dealings of said Horace J. Perrin, with the property hereinbefore described as owned by himself and Joseph Sibley as tenants in common, at the time of said Sibley's death, and that the balance due said H. J. Perrin on said accounts may be ascertained and liquidated, and that the same may be decreed to be paid to your orator out of the assets of said Sibley's estate, and that the same may also be decreed to be a lien upon the individual half of said property owned by the estate of said Joseph Sibley or his representatives, and that the said Sibley interest in said property may be sold, and out of

the proceeds the amount due the estate of said H. J. Perrin may be paid.

"5. And that an account may be taken of the dealings of the said Horace J. Perrin with said estate of Joseph Sibley, as executor thereof.

"6. That the said Sibley heirs may be made parties defendant to this suit, and required to answer this amended bill of complaint, and that it may be adjudged and decreed by this honorable court whether the said Sibley heirs have any rights or interests in said estate of Joseph Sibley, or any right to an accounting with your orator in respect thereto, and which of said parties are entitled to such an accounting, and that the accounting in this suit between your orator and the representatives of said Joseph Sibley and the said Anna Louisa Fisk, or the said Sibley heirs, or either of the parties entitled thereto, in respect to the matters alleged in this amended bill, may be final and conclusive, and bar and preclude all of the said parties from making any further or other claim against your orator on account of their alleged interest in the said Sibley estate.

"7. And that your orator may have such other and such further relief in the premises as the circumstances of the case may require, and to this honorable court may seem fit."

This bill, filed in February, 1881, was perfected by amendment, and refiled January 30, 1883. The time intervening between these two dates the record shows was given by Lepper and his counsel, and by Mrs. Fisk and her counsel, to the most vigorous efforts in obtaining—

1. All the books and papers then in existence, containing any and all the evidence relating to the business of the copartnership conducted by the firm, while the same existed, and showing its condition, and the situation of the property when Joseph Sibley died.

2. In acquiring knowledge from every available source showing the management of the firm and tenant in common property, and the individual estate, under the trusts confided to, and the requirements which the law laid upon, Horace J. Perrin in their management, and what

disposition he made of the Sibley interest after Sibley died, so long as Perrin had the control and management of the property."

They brought to their aid in these efforts all the means apparently within their power, and for this purpose gave their entire attention to the work, and secured the assistance of skilled accountants to aid them in such examination of the books and papers as could be obtained, and in making up proper accounts; but the same difficulty was encountered by them all which had been met by all persons who undertook to make such examination from the time Francis M. Sibley became of age to the day complainant's amended bill was filed.  It was the difficulty in obtaining the necessary books and papers or information from those who knew all about the matters under investigation, but withheld the same when properly called for; and the marked ability and perseverance of the learned and distinguished counsel for the defendants, brought to bear in their efforts as the work of investigation progressed, as we have had occasion to observe them in making our examination of the record, have challenged our admiration.

The persons living who knew very much about the books and papers desired were William Powell, who was H. J. Perrin's clerk and book-keeper from May, 1860, for six years continuously thereafter, and who kept the books during that period, and then again re-entered the service of H. J. Perrin in Chicago, and while in his employ went to New Haven, and there sold flour, feed, and grain, the products of the mill, and did the same in Rhode Island, remaining there until he returned to Marshall, in 1872, where he continued in Perrin's employ in the National Bank of Michigan as its cashier, until the month of May, 1880.  This bank was the successor of the Bank

of Michigan, which was run by the firm until the National Bank was organized, in January, 1866, and the books of which were kept by Mr. Powell, as were those of the National Bank thereafter. In keeping the Bank of Michigan books, and those of the firm, Mr. Powell was assisted by William E. Gill, another book-keeper and accountant, who was the other person who had knowledge of the things desired and queried after by the defendants; and it would appear from the record that the complainant had only such knowledge of the transactions of the firm as the books and papers gave him, aside from what information he obtained from H. J. Perrin in his life-time (of which we get little aid from the record), and what was communicated to him by these two clerks and accountants.

It may or may not be a misfortune that Francis did not have the aid of Mr. Powell, before he died, in his efforts to obtain the estate which he claimed. Powell, certainly, as he says in his letter to the attorneys of Francis in 1868,—

" Probably knew more about their [meaning the firm] affairs than any one else beside themselves;" that he " had charge of their banking office, kept the books, not only of their banking business, but of all their outside business,"—

From the spring of 1860 to 1866; and, after reading H. J. Perrin's answer to Francis' bill, wrote him from Chicago, in November, 1868:

" There is a nigger in the fence. * * * H. J. P. was here a week ago to-day;"—

And in March following wrote Francis:

"You are being swindled outrageously."

This man and Mr. Gill have been with the Perrins in their contest with the Sibley estate, and it is through their manipulation of the books and papers that the com-

plainant has been able in his bill to say and aver that, the firm was insolvent, and the estate of Joseph Sibley is worthless; when it is now conceded that in fact the firm was solvent, and H. J. Perrin died owing to the Sibley estate a very large amount of money. The books of the Bank of Michigan were never found. They were either withheld or destroyed. There was no way until a short time before the defendants Lepper and Fisk filed their answer by which they had been able to get at the true relation of that bank to the firm. The examination of defendants, however, about that time, accidentally disclosed the paper known in the record as the "Anomalous Instrument." After this disclosure, and some others, then and subsequently occurring, the defendants Lepper and Fisk proceeded to make their joint and several answer to the complainant's amended bill. It and the schedules thereto annexed contain 189 pages of the printed record.

This answer alleges that H. J. Perrin, when he came to Marshall, had but little capital; that at brief periods prior to October 11, 1858, he was in partnership with Darius Perrin; that it was his practice during this period to hold out to the community that Darius was his partner, when, as between themselves, he was not, and that this was done with Darius' consent; that prior to April 3, 1850, H. J. Perrin became the owner of the Kalamazoo River Mill property, except lots 1 and 3, with the water rights appurtenant thereto, and on that day conveyed the same to Darius; that before January 28, 1858, he purchased lots 1 and 3, and conveyed them with the other lots to his sister Anna Perrin, a young lady without means or responsibility, and who it is claimed executed back to Horace a mortgage for $75,000; this mortgage was never recorded, and has never been produced, and it is claimed was entirely fictitious, and represented

no actual indebtedness, and created no lien, except on lots 1 and 3; that May 10, 1860, Anna Perrin, then Anna Tuttle, redeeded all the lots to H. J. Perrin by a quit-claim deed; that Perrin carried on business alone from July 1 to October 11, 1858; that in 1857 the mill on said lots burned, and was rebuilt by Perrin, at a cost of about $14,000; that prior to 1858 he carried on the banking and grain business with Charles T. Gilbert, sometimes using the name of Perrin & Gilbert, and sometimes H. J. Perrin & Co.,—Gilbert contributing considerable of the capital; that Perrin and Gilbert or H. J. Perrin, early in 1858, organized the State Stock Bank of Eau Claire, Wis.; that prior to October 11, 1858, state bonds of the nominal value of $120,000 had been deposited with the state treasurer to the credit of the bank, and $100,000 in currency had been issued thereon, and of this circulation Perrin's individual books show he received $31,500. It does not appear what became of the rest. This firm was dissolved July 1, 1858.

The answer further alleges that Perrin's business in the fall of 1858 had become greatly extended, and that he was in peril of being compelled to suspend payment; that his business was done largely on borrowed capital, and, in this crisis of his affairs, he sought Joseph Sibley, and engaged him in the partnership composing the firm of H. J. Perrin & Co., which was formed, as before stated, October 11, 1858.

They deny that Darius was ever a member of this copartnership, notwithstanding his name was sometimes used as a partner, and may have been such as between himself and Horace J. Perrin; aver that he never put in any capital, and the partnership books contain no evidence that he was a partner, but much tending to show he was not, and that he became insolvent as early as 1864.

They admit that the partnership between H. J. Perrin and Sibley continued until Sibley died, and aver that the renewal article does not contain the words, *"all interest in each's capital and paper to be seven per cent. from 1858;"* that H. J. Perrin fraudulently inserted these words at the end of the instrument after Sibley died; that, while Sibley put into the capital about $104,000, no account was kept upon the company books of the amount contributed by Horace; that the accounts are so fraudulently kept with Horace that it is impossible to tell what he did contribute as capital, but that one item of his claimed capital was the fictitious $75,000 · mortgage credited to Perrin December 31, 1858, and which when so credited amounted to $79,913.20; that eliminating this fraudulent and worthless item to the credit of H. J. Perrin on the partnership books, and where it is claimed his capital appears, the books show that there stood to his credit, on December 31, 1858, $38,792.96, which includes mortgages to the amount of $18,607.23; June 4, 1859, $45,813.52; September 9, 1859, he was credited for State Stock Bank, Eau Claire, $32,935.34, put into the firm as of October 11, 1858,—making a total credit then $80,414.38; April 1, 1861, it was $43,579.48; January 1, 1862, $44,897.43; January 1, 1863, $46,515.28; January 9, 1864, it was increased to $110,003.43, the increase made up by a credit of $65,000, under date of November 19, 1863, it being Sibley's check for that amount on his purchase of one-half of the Kalamazoo River Mill property, and without this, at the time of Sibley's death, it was but $45,003.43,—and that if the real estate purchased and improved from partnership assets during the existence of the firm was the individual property of Perrin, as is now claimed by complainant, his capital stock would have been very much lessened

And further say they deny the capital of Joseph Sibley was lessened by his drafts upon the firm to the amount

of about $70,000, and which was used up by him in the purchase of real estate soon after the formation of the firm, which, with losses of the firm in its business, exhausted the interest of Sibley in the firm.

They aver that the business of the firm resulted in large profits; that Sibley never drew out any portion of his capital; that his capital account was never encroached upon, and that his drafts were all upon his individual account during the existence of the firm; that until October 19, 1863, he drew no drafts or checks upon H. J. Perrin & Co. exceeding the amount standing to his credit on his private account, and they are informed and believe that there was due to him from the firm at the time the draft of $65,000 was made a sum largely in excess of that amount; that Perrin transferred his interest in the Eau Claire Bank, which was the controlling one, to the firm, and took credit on the books for the same, as before stated, and before the 1st of January, 1859, Joseph Sibley was made president of it, and H. O. Pratt, the clerk of the firm, was made cashier of it, and so remained while that bank existed; that, during the first two years of the partnership, H. J. Perrin & Co. deposited with the state treasurer of Wisconsin state bonds to the amount of $361,700 face value, and received the circulating notes of that bank to the amount of $175,000; that in December, 1859, H. J. Perrin & Co. organized, under the general banking law of the state of Illinois, three more banks, similar in character to the Eau Claire Bank, Wis., and between March 15 and August 30, 1860, they deposited with the treasurer of the state of Illinois, in the name of the State Stock Bank of St. Johns, state bonds to the amount of $169,250, rated at the time at the sum of $151,610, and received circulating notes to the last-named amount; that between July 14, 1860, and January 2, 1861, they deposited, in the name of the Commercial Bank of New

Haven, state bonds to the amount of $83,000, rated at $67,980, and took out circulating notes to that amount; and on November 5, 1860, they deposited, in the name of the Cumberland County Bank, state bonds to the amount of $54,000, rated at $50,780, and issued their circulation to the amount of $50,778. The aggregate amount of bonds deposited in these four western banks was $667,950 face value, and the circulating notes received by them were $443,191. The bonds all drew interest.

These banks were used as instrumentalities of the firm of H. J. Perrin & Co., and the circulating notes were used by the firm in the business of banking, buying wheat, making flour, buying wool, and loaning out on bonds and mortgages. The State Stock Bank at Eau Claire always stood (except a trifling number of shares) in the name of Oliver C. Perrin, a brother of H. J. Perrin, a young man without means, who resided at Rochester, N. Y., and who had no actual interest in the bank. The articles of association of the three Illinois banks were each signed by Anna P. Tuttle, the sister of H. J. Perrin, and A. W. Nason. She was represented as the owner of 2,995 shares of capital stock of each bank, and said Nason the owner of the other 5 shares, and neither of whom was responsible, or had any actual interest in the banks, and neither of these western banks had any capital other than the bonds deposited in its name. H. J. Perrin was president of the State Stock Bank of St. Johns, and of the Commercial Bank of New Haven, and A. W. Nason, cashier. A. W. Nason was president of the Cumberland County Bank, and E. Nason, cashier.

In 1861, during the panic, all these banks suspended, and went into liquidation, except the Cumberland Bank, and that did for a time. In December, 1861, the bills of these banks were quoted from 50 to 75 cents, and in May the Eau Claire Bank from 30 to 60 cents.

Defendants further say for a year and a half prior to this H. J. Perrin & Co. had a branch banking office at Chicago, under the immediate management of H. J. Perrin, who spent much of his time there looking after these western banking operations. On May 1 he wrote to H. J. Perrin & Co., at the home office, as follows:

"H. J. PERRIN & Co.,
                    "Marshall:

"Will telegraph you in the morning to handle no more western, as I think there will be a general crash here in less than ten days. It is fortunate I came over, as we are now all cleared up, no currency on hand, and owe no one, while we hold the grain receipts for what is due. I expect there will be trouble in New York, and general suspension, and I should again recommend doing nothing except with full receipts for flour."

The defendants further aver, upon their information and belief, that in the company's western banking operations, including their dealings in discredited circulation, they made very large profits. They further show that the company's Bank of Michigan, located at Marshall, started in 1862, with a capital of $50,000, which in April, 1863, was increased $10,000, and in November of the same year was again increased $50,000; that the Bank of Michigan was organized under the general banking law of Michigan; that its articles were signed by the said Anna P. Tuttle, who is represented as owning 495 shares, Sibley 3 shares, and Perrin 2 shares; that Mrs. Tuttle never had any interest in the bank, and was irresponsible, but her name was used that personal liability of H. J. Perrin & Co. might be avoided for any indebtedness of the bank; that the firm deposited Indiana and Illinois state bonds to the amount of $104,428, upon which they obtained circulation to the amount of $78,892, and which was used in the business of the firm; that at the time Sibley died there was on deposit of the bonds $78,968, and the circulation then outstanding was $74,392; that the circula-

tion was all redeemed, and the bonds withdrawn, by H. J. Perrin before June 2, 1868; that during the partnership it had no capital other than the bonds to secure circulation; that this bank, like the western banks of the company, was a mere instrument by which H. J. Perrin & Co. obtained its currency to carry on its business and loaning money; that during the entire existence of the partnership, from its beginning to its close, the regular banking business—receiving deposits, selling exchange, discounting commercial paper, and also the loaning of money on bonds and mortgages in the copartnership name —went on as if the banks they organized did not exist, and was constantly and rapidly increasing, making profits in all the business in which the firm was engaged.

The real estate in which the firm dealt largely the defendants say was purchased with partnership funds, and, as they verily believe, was all partnership property, and was mostly taken in the names of some one or more of the Perrin family,—occasionally in the name of J. Sibley; and they aver there is nothing on the books tending to show that it was the individual property of either of the parties. Defendants then call attention to 23 parcels of real estate, some of them containing very large quantities of land, the equitable title to which was in the firm at the time-Joseph Sibley died, except as contracted away or conveyed by it.

Defendants next give in detail, so far as they can, the dealings with the same by H. J. Perrin; also of the other kinds of business; and call attention to the changed condition of the deed of the Montcalm county lands.

They further show that at the time of Sibley's death the firm of H. J. Perrin & Co. were carrying on farming on ten of these farms, lying in the vicinity of Marshall, and had thereon a large quantity of stock and tools for that purpose, and a very large quantity of sheep, some of

which they kept on the farms, and others they let out upon shares to farmers; that their stock of horses was large, consisting of 41 horses and colts, and 18 mules, besides such as had been bred upon the farm.

Defendants further state that on April 30, 1859, H. J. Perrin executed to H. J. Perrin & Co. a quitclaim deed of Mill lots 1, 2, 4, 5, 6, 7, and 8, in Marshall, heretofore referred to, the legal title to which stood in Darius Perrin, except lot 1, which stood with lot 3, in Anna Perrin, subject to the $75,000. It also covered other lands to large amounts lying in Calhoun, Jackson, Allegan, Oakland, Van Buren, and Montcalm counties, to some of which the record shows title in Perrin, and to some of which it does not. This deed as drafted, and as the defendants believe read when executed, was made to "H. J. Perrin and Joseph Sibley, composing the firm of H. J. Perrin & Co.," but, as it appears of record, it now reads: "Horace J. Perrin and Joseph Sibley and Darius Perrin, of the firm of H. J. Perrin & Co.;" and the defendants charge, upon information and belief, the change was made by H. J. Perrin after the deed was executed, and before its recording, which was not until November 10, 1860; and that by deed dated April 9, 1860, but not acknowledged until December 31, 1863, or recorded until June 11, 1867, Darius Perrin quitclaimed to Horace J. Perrin all the lands described in the deed of April 30, 1859, except the Mill lots. By another deed dated March 4, 1862, acknowledged April 3, 1862, and recorded November 2, 1864, Darius quitclaimed to H. J. Perrin all the lands described in the deed of April 30, 1859.

That by a transaction commencing in the fall of 1863, and consummated in January, 1874, Joseph Sibley was induced to purchase the undivided half of the Mill property, at the price, as is claimed, of $65,000. This Mill

property, which was sold to Sibley, was conveyed by warranty deed by H. J. Perrin, dated, as shown by the record, December 6, 1861, and recorded November 23, 1863. It appears to have been acknowledged December 6, 1862; and it is alleged that the "one" in the date of the deed is written over an erasure, and defendants are informed that it was a common practice of H. J. Perrin to postdate deeds, and other instruments, and to procure certificates of acknowledgments by Powell and A. H. Holmes, as notaries, to be falsely dated, or to be signed in blank, and be filled up by himself afterwards; and they charge that this was antedated for the fraudulent purpose of a certain mortgage transaction bearing the date of December 6, 1861.

And it is further claimed that this deed was dated back to 1861 for the purpose of limiting the right of ·flowage to such lands only as H. J. Perrin had at that time. The rents and profits of the property were reserved in this deed until November 19, 1868.

Defendants further allege that H. J. Perrin claimed and exercised the powers of testamentary guardian of Francis during his minority, and also claimed to exercise the power and control and management as trustee which the will gave to the executors; that Francis was entitled to receive, under the will of his father, $3,000 when he became of age, and $1,000 thereafter per year until 25 years old; that whether after that time he should receive anything more than his annuity for life depended upon his (Horace's) opinion of Francis' capacity; that H. J. Perrin, thus entrenched in the possession of all of Joseph Sibley's estate, with its rents and profits, and of all the papers relating thereto, and nearly all other information, with ·no one to call him to account but the youthful heir, who lived in fear, if he displeased Horace, of being cut off of what he conceived to be a paltry annuity, the

executor proceeded, by an almost infinite variety of methods, to fraudulently appropriate the estate to his own use; that he filed a false and fraudulent inventory of the Sibley estate; that it is unintelligible and misleading; that it falsely and fraudulently represented the estate as having, as tenant in common, a one-third interest in two farms, a one-half interest in the mill, a farm, and the Marshall House, and one-sixth interest in a hall, a hotel, and the Marshall House, whereas, with the exception of the hall and hotel, they were all the property of H. J. Perrin & Co., and of the hall and hotel the firm owned an undivided half, and the estate had no interest in either; that he permitted large claims in his interest to be allowed against the estate, and no proper notices of the meetings of the commissioners were given; that he permitted claims to be allowed against the estate which were against H. J. Perrin & Co., while he, as surviving partner, had the money and assets in his hands to pay the claimants, and also permitted fraudulent claims to be allowed against the estate.

Defendants further say they deny that Francis acted in conjunction with H. J. Perrin, or assented to the improvements made by H. J. Perrin on the tenant in common property, or that he ratified and confirmed all the expenses in making the same after he became of age, but admit he made no active opposition while the improvements were being made; and they aver it was, not for Francis' interest to make such improvements, and that Perrin denied to Francis the privilege of examining the vouchers and books necessary to ascertain the expenses actually incurred in making same, and that such cost was greatly less than the amount charged by Perrin; that the rebuilding of the stone mill after taking out the insurance was less than $13,000, and the half of the same, now charged to the Sibley estate at $18,000, is $5,843.36; that this appears

from what is found on H. J. Perrin's private journal and ledger; that they aver that the instruments signed by Francis in regard to such improvements were obtained by misrepresentation and fraud and intimidation.

Defendants further aver that the leases of the tenant in common property to Darius Perrin until the receipts should pay $31,000, or until said sum and interest were paid, were a sham, and a fraud between Horace and Darius for the sole purpose and object to render it more difficult for Francis to rescue his father's estate from the grasp of H. J. Perrin; that Darius never advanced a dollar of the $31,000, but at that time was insolvent, and ever since has been, and that the rents and profits of said property were received by Horace, as is shown by what is left of his books; that Francis did not, during his life-time, have knowledge of the frauds that had been practiced upon him as the heir to his father's estate.

Defendants further say that Francis' mother, Joseph Sibley's widow, was then alive, but could give him no aid in looking after his interest, in protecting it against the frauds of Perrin; that she was an infirm woman of feeble intellect, and incapable of advising him in business matters, and that Horace very soon, by the course he took with her, gained great control over her, which neutralized her influence, such as it was, in behalf of her son, and she was even induced to file a very large and unnatural claim against his estate.

Defendants, further answering, aver that the entire stock of the Bank of Michigan was owned by the firm of H. J. Perrin & Co.; that there was no separate ownership in either of the partners; that the capital was the bonds deposited to secure the circulation, and the stock represented nothing but these bonds; and that whether the pretended checks, one of Joseph Sibley for $10,000, and of H. J. Perrin & Co. for $80,000, for this stock,

were ever given during Sibley's life-time or not, is immaterial, as, between the parties owning the bank, they represented no indebtedness whatever.

Defendants further aver that the information Horace J. Perrin pretended to furnish to those interested in the property of the firm, and of the estate, from Sibley's death to the time of Perrin's death, and that contained in his inventories filed and accounts left with the judge of probate, and given in his answers to the several bills in chancery filed against him, or in any other way, was so meager, fragmentary, and false, and the statements so inconsistent and confusing, that but little light, and less satisfaction, could be obtained therefrom; and they further aver that, since the death of Horace, his executor, as well as his assistants, claimed and deposed to such ignorance of the matters relating to said firm and estate, although in possession of all the books and written information relating thereto, that defendants have with great difficulty got any information of importance from them.

Defendants further say that the information which they have been able to get of the affairs and condition of the firm, and its operation, and the condition of the estate, has been from the examination of such books and papers as they have been able to find mostly; but these were erroneously and fraudulently kept, from a very early period in the partnership, and especially during the last year of Joseph Sibley's life, when he had become very infirm and feeble, both in mind and body, so as to be unable to pay, and did pay, but little attention to business matters; that there was no detailed statement of the operations of the firm appearing at the time of Sibley's death, and no correct one since.

Defendants further aver that H. J. Perrin, on the 19th of October, 1864, transferred to the Bank of Michigan all, or nearly all, of the debit and credit balances on the

partnership books, and thereafter kept the partnership accounts, and the accounts of his dealings with the partnership assets, for the most part, on these books, down to January 1, 1866, and to some extent, as to some accounts, for a long time thereafter, and he treated this transfer as a sale of the copartnership assets to the Bank of Michigan, and, as he claimed, to provide funds to pay the partnership liabilities; that, by this same proceeding of H. J. Perrin, the bank became the owner of the bills receivable, bonds, and mortgages, and the other assets of the firm; that, if the bank had any stock, it all belonged to H. J. Perrin & Co., and, it not being quite clear to him that all the interest of the Sibley estate had passed to the bank, he caused the following instrument to be made and executed; it being the anomalous instrument heretofore referred to:

"WHEREAS, the firm of H. J. Perrin & Co., consisting of Darius Perrin, Jos. Sibley, and H. J. Perrin, of Marshall, Michigan, did in the month of November, 1862, and during the year 1863, purchase certain bonds, and exchange the same with the Treasurer of the State of Michigan for bills of circulation issued to the Bank of Michigan, at Marshall, Michigan, the stock of which was taken mostly by Anna P. Tuttle, said firm of H. J. Perrin & Co. being unwilling to become liable for the redemption of said bills, as stockholders of said bank, but did open an account on their said firm books, charging said bank with what money they used in the purchase of bonds pledged in exchange for circulation with State Treasurer, and crediting said bank on their said company books with all said circulation so obtained and received in exchange for or on the same from time to time; there being no capital paid in, except in so purchasing said bonds, which was mostly immediately re-imbursed by the issue and return of bank currency issued by said State Treasurer for said bonds,—all of which transactions and doings were kept on the books of said H. J. Perrin & Co., no books being opened by said Bank of Michigan until the 18th of October, 1864.

"But whereas, said bank had agreed for a banking-house previous to the death of Joseph Sibley, and had made checks on said so styled bank, signed, 'H. J. Perrin & Co.,' by said Joseph Sibley, for the sum of $80,000, said bank not then having any capital paid in (except such as had been previously repaid by its bills so issued

by said State Treasurer) wherewith to pay any portion of said checks so drawn by said Joseph Sibley in his life-time, or any capital or money of any considerable amount paid in, except what had been so paid for said bonds so hypothecated with said State Treasurer.

" And whereas, this company has no funds to contribute wherewith to pay said checks so drawn by said Sibley on said bank in the name of and for said H. J. Perrin & Co. on said so-styled ' Bank of Michigan,' in the name of said H. J. Perrin & Co.

"Now, with a view of closing up any liability growing out of said checks, or any agreement relating to the bank building, it is agreed that the checks so drawn on said bank for the said $80,000, by said H. J. Perrin & Co. (for which said stock was never transferred by the original subscribers), may be paid by disposing of so much of said stock, now treated as so much stock, namely, $80,000, if the same can be done at par; that is to say, we, the surviving partners of the firm of H. J. Perrin & Co., fully authorized under the articles of copartnership to finally settle all matters relating to said partnership, do hereby agree, consent, and direct that whereas, the estate of said Joseph Sibley has treated said checks as debts, that said stock be so sold at par,—that is to say, that said stock may go to offset said checks, so drawn on said nominal Bank of Michigan, in the name of H. J. Perrin & Co., and used as an offset to the same, be so disposed of as soon as practicable, which, when done, is to release the said H. J. Perrin & Co. from all liability in any way with said bank; our object being to be released as a company and individually from all transactions, either past or future, with said bank,—it being considered that the depreciation on building, corn, etc., should prevent any further claims.

" *December* 8, 1865.           H. J. ·PERRIN,

" One of the Survivors of H. J. Perrin & Co., and Sole Executor
of J. Sibley, Deceased.

"DARIUS PERRIN,

" And as survivor of H. J. Perrin & Co.

"H. J. PERRIN & CO "

He also caused the fictitious checks, one for $10,000, and the other for $80,000, the first purporting to be signed by J. Sibley, and the other by H. J. Perrin & Co., to be drawn on the Bank of Michigan, claimed to have been given for stock, and caused them to be allowed before the commissioners on the Sibley estate.

The National Bank of Michigan was but a reorganiza-

tion of the Bank of Michigan. H. J. Perrin was the owner of all its stock. A few shares were in the name of others. The bonds transferred to the Bank of Michigan could not, however, be used as security for its circulation, as it was an organization under the federal statute. Therefore H. J. Perrin, as president, and said William Powell, as cashier, executed the following instruments:

"WHEREAS, the comptroller of the currency refuses to allow this bank to hold bonds and mortgages as a part of its assets; and whereas there is a large balance due H. J. Perrin from the bank sufficient to pay for said mortgages: Now, in consideration of the sum of one hundred and forty-five· thousand one hundred and eighty-one dollars and forty-two cents ($145,181.42), we hereby sell, assign, transfer, and set over the mortgages and accompanying papers as set forth in this sheet; that being the amount of principal and interest due, and to grow due, on the same to this date, April 1, 1866. And we hereby guarantee the same shall be paid, with principal and interest.                    H. J. PERRIN, Pt.
                                   "W. POWELL, Cas.

"This list of mortgages having been heretofore duly assigned by the firm of H. J. Perrin & Co. to the Bank of Michigan, we do, for a valuable consideration, hereby affirm and ratify said assignment, and consent to the foregoing assignment and the transfer of the same to H. J. Perrin, and we do hereby assign, transfer, and set over to said H. J. Perrin all interest we have in said mortgages, and guarantee to him the payment of the amount due thereon.
                        "H. J. PERRIN & Co.,
                              "By Darius Perrin.
                        "DARIUS PERRIN, Surviving Partner."

These mortgages, thus assigned, include those belonging to the firm of H. J. Perrin & Co. at the time of Sibley's death, and those which belonged to Sibley individually, so far as they remained unpaid, together with a few mortgages which had since been acquired. What was done with the other assets does not appear, but defendants aver that they all found their way, so far as they can be traced, upon the partnership books as balances, and in that shape went into the Bank of Michigan, and through it to the National Bank or to H. J. Perrin.

Defendants in their answer further say that it was by this kind of shifts that H. J. Perrin sought to absorb the estate that it was his duty to protect and defend; and further say that in 1868 H. J. Perrin commenced the destruction and secretion of the evidence by which this absorption might be shown; that he did this by transferring from the books of the Bank of Michigan to a private ledger and journal such items and accounts as he wished to preserve, in such form as would conceal as far as possible his fraudulent dealings with the partnership assets, but that this was not successfully accomplished; that having secured the transfers he wished, nearly every other book and paper containing original evidence of the transactions of the Bank of Michigan, of H. J. Perrin, whether individually or as surviving partner, or as executor, between October 19, 1864, and January 1, 1866, have been suppressed or destroyed; that all of H. J. Perrin's dealings with the partnership property and interest of Joseph Sibley were fraudulent and void.

Attention is then called to his dealings with the copartnership real estate, as far as they appear; and the defendants aver that it was collusive and fraudulent, and had with the fraudulent intent to deprive the estate of Joseph Sibley of its interest therein, treating each item separately, and showing, as they claim, the means by which it was attempted to be done.

They further deny the correctness of each and all the schedules attached to complainant's bill, and aver that no account can be made from the books and papers which have yet come to light or been referred to, by which a correct account can be made up, and that made and presented by complainant and his accountants is clearly wrong, and is so erroneous and fraudulent in its plan and structure, and so false and fraudulent in its details, so far as any are stated, that it cannot be made the subject

of judicial investigation; and they aver that, by reason of the suppression and destruction of the partnership papers and the books of the Bank of Michigan, the destruction of inventories, and many other important papers and books, and by reason of the fraudulent entries made by H. J. Perrin in those which now exist, no reliable *data* now exists for making a surviving partnership account which will approximate, even in a remote degree, to accuracy.

Defendants further aver, however, that the *data* do exist for ascertaining, with reasonable certainty, what principal, interest, and shares were received by H. J. Perrin & Co. during the existence of the firm, or by H. J. Perrin, either in his own name or in the name of the Bank of Michigan, or of the National Bank of Michigan, on the various securities put into the firm by Joseph Sibley as capital, and such as were afterwards taken in renewal, or in lieu of some of them; and they further aver that the complainant's bill does not contain a true statement of the liabilities of the firm paid by Perrin after Sibley's death, nor a correct statement, as near as complainant could make, of the moneys received by Horace from the assets of the firm, nor does it contain, in effect, a true and correct statement of the results of the administration of the affairs of H. J. Perrin & Co.

The defendants deny that there is due to the Perrin estate $35,000 on the tenant in common property account, but aver that a larger sum is due the estate of Sibley on that account; that H. J. Perrin, as executor from 1864 to 1880, insured and leased the undivided half of the tenant in common property, and received the rents and insurance therefrom as such executor; that no books of original entry containing these accounts have been produced or found, and no true account in respect to the common property can now be made up; that the accounts

rendered by Horace to the judge of probate, during his life-time, of the estate of Joseph Sibley, are erroneous and fraudulent, and cannot be dealt with by the court without being wholly reconstructed; that they contain no account of the proceeds or income of the bonds and mortgages belonging to the Sibley estate after September 10, 1864, and assign as a reason that they were then transferred to the Bank of Michigan for the purpose of raising money to pay the widow's legacy; that such purpose was a sham, made for the purpose of avoiding an accounting for the income, and that such pretense was fraudulent and untrue.

And defendants attached to their answer a supplementary inventory of the individual estate of Joseph Sibley, correcting errors and supplying omissions in the inventory filed with the judge of probate. They also annex a true account of Perrin's administration of the individual estate of Sibley other than the tenant in common property, except they have not charged interest on balances which they claim should be allowed; and defendant Lepper avers that there are no assets in his hands, or to come into his hands, from the Sibley estate, except from the estate of Perrin, with which to pay litigation expenses, and defendant Fisk avers she is almost destitute of the means to pay such expenses.

And both Lepper and Fisk aver, upon information and belief, that Darius Perrin, from the time of the formation of the partnership of H. J. Perrin & Co. until the summer of 1879, was the confidential friend and adviser of H. J. Perrin, and was fully informed of his general purpose to defraud Joseph Sibley while living, and his estate after his death, and to a great extent as to the means to accomplish that purpose, and that he aided and abetted in all the ways he could to accomplish the result finally reached, whereby Horace assumed the

ownership of all the Sibley estate, and, before the heir reached the age of 26 years, he was informed his patrimony had been swallowed up in the management and settlement of the estate, which was then found to be insolvent.

Defendants further aver that it was largely through the influence of Darius Perrin that Francis M. Sibley was induced to execute instrument No. 1, herein referred to; that, to aid in defrauding Francis, Darius fraudulently pretended to have advanced $31,000 for improvements upon the tenant in common property, and have a lien upon the income thereof for that amount, under instruments Nos. 2 and 3, herein referred to; that he fraudulently pretended to be a partner in the firm of H. J. Perrin & Co., and, as such, to be the owner of one undivided one-third of the real estate and other assets of the company; that he aided Horace in the secretion of books and papers, concerning the assets and affairs of the firm; that he claimed and pretended to be one of the surviving partners of the firm, and as such joined Horace in the fraudulent transfer to the Bank of Michigan of bonds and mortgages which were firm assets, and fraudulently assented to the pretended assignment of them by the National Bank of Michigan to H. J. Perrin, when he knew they were the assets of H. J. Perrin & Co., and of the estate of Joseph Sibley; that he advised, counseled, and aided in transferring title of the copartnership real estate to his daughter Caroline E. Perrin; and finally denied, under oath, in his answer to Mrs. Fisk's bill hereinbefore referred to, upon his information and belief, that the firm made any profits, when he knew and had good reason to believe to the contrary; and they claim for their answer the benefit of a cross-bill.

Such are the more important portions of the answers.

of defendants Lepper and Fisk; their prayer reading as follows:

" 1. These defendants, as well as the complainant, pray for a full and complete accounting and settlement in regard to Horace J. Perrin's administration of Joseph Sibley's estate, including an accounting and settlement in respect to the copartnership affairs of H. J. Perrin & Co., and the dealings of Horace J. Perrin, as executor or otherwise, with the property owned by Horace J. Perrin and Joseph Sibley as tenants in common.

" 2. They pray that this court may inquire into such matters as may be necessary for that purpose, and determine, by a preliminary decree, the principles upon which such accounting shall proceed. Thus they pray, among other things:

" *First.* That this court may decree that the report of the commissioners on claims against Joseph Sibley's estate is wholly void, because

" 1. It appears therefrom that notices of the meetings of the commissioners were not posted in the manner required by law, and by the warrant to the commissioners.

" 2. Because such notices were not in fact posted.

" 3. Or, if not wholly void on these grounds, that as to the claim appearing to have been allowed subsequent to that in favor of Manlius Mann, the report be set aside and declared void on other grounds, stated in paragraphs 86 to 96 of this answer, and that all charges in the executor's account for the payment of any of these claims be disallowed.

" *Second.* That this court may decree that the purchase by Joseph Sibley from Horace J. Perrin of an undivided one-half of the Kalamazoo river mill property, for $65,000, was made in November, 1863, or later, and that it embraced an undivided half of all flowage rights appurtenant to the property which Horace J. Perrin then owned; but that, for the purpose of defrauding Joseph Sibley of his estate in respect to the right of flowage, Horace J. Perrin either caused his conveyance of the property in consummation of this purchase to be antedated to December 6, 1861, or fraudulently altered the date after the execution and delivery of the deed, and before its registry.

" *Third.* That this court may decree that the deed of Joseph Sibley and wife to Horace J. Perrin, of April 2, 1864, if any such deed was executed, was wholly without consideration; that it embraced, as recorded, nearly all rights of flowage appurtenant to the mill property, an undivided half of which Joseph Sibley had purchased from Horace J. Perrin in the previous November for $65,000; that the Calhoun and Montcalm county lands described in it, as recorded (except flowage rights vested in Joseph Sibley by the before-mentioned deed of the mill property), were partnership properties; that the lands in Marengo were all more or less flowed

by the dam of the Kalamazoo river mill property; and that either—

"1. No such deed was ever executed; or,

"2. As executed it did not embrace the Calhoun or Montcalm county lands, but that the descriptions of them were fraudulently inserted by Horace J. Perrin, or by his procurement, after Joseph Sibley's decease, and before registry in Calhoun county; or,

"3. That as to these lands the conveyance of them was in trust for the firm; and that in 1866 Horace J. Perrin placed this deed, or pretended deed, on record, and fraudulently claimed the ownership of these lands, divested of any trust, and subsequently fraudulently conveyed the same to, or caused the title thereof to be in some other way vested in, third parties.

"*Fourth.* That this court may decree that the execution of instruments number one, two, three, four, referred to in the (25th) paragraph of the amended bill, and the 98th paragraph of this answer and of instruments numbered five and six, referred to in the (27th) paragraph of the amended bill, and the (99) paragraph of this answer, all relating to improvements upon the Kalamazoo river mill property, so far as they were executed by Francis M. Sibley, was procured by fraud and undue influence, and that the same be set aside and declared void.

"*Fifth.* That Horace J. Perrin's estate, if entitled to make any charge in this executor, or tenant in common account, for improvements, other than reasonable or necessary repairs upon the mill property, those charges must be limited to the actual benefits received by J. Sibley's estate in the way of increased rents and insurance money, in no case exceeding the actual costs of the improvements.

"*Sixth.* That the accounts rendered in schedules G, H, and I, annexed to the amended bill of complaint, of the rents and income and insurance moneys received for losses by fire upon the mill property, and of the expenditures thereon, are not only false and fraudulent, but too insufficient and confused to be made the basis of judicial investigation, except for the purpose of determining their character.

"*Seventh.* And that the books and papers containing the *data* for making a just or true account of H. J. Perrin's dealings with this property have been to such an extent fraudulently secreted or destroyed by Horace J. Perrin or his representatives as to render the making up of such an account impossible.

"*Eighth.* That in view of the fraudulent and wrongful acts of Horace J. Perrin, whereby clouds upon and embarrassments of the title of the undivided half of the property, and rights of flowage appurtenant thereto, have been created, and the difficulty of estimating the damage caused thereby, and his other fraudulent dealings with the property, and failure to render true accounts in respect to it, and his secretion or destruction of the *data* from

which such an account can be made, it may be decreed that, if these defendants so elect, on the execution by them of a proper quitclaim and release of all interest in this mill property, and the income thereof, and insurance moneys received for losses by fire thereon, and accounting for such rents as they, or either of them, may have received therefrom since H. J. Perrin's decease, it shall be a full satisfaction of all claims against J. Sibley's estate for the $65,000 of purchase money for the undivided half of the property; and the accounts of Horace J. Perrin's administration, as executor and surviving partner, shall be adjudged upon the same basis as if Joseph Sibley had never purchased or owned an undivided half of the mill property.

"*Ninth.* Or, if this relief is not granted, these defendants pray that it may be decreed that, in the accounting in respect to the property, Horace J. Perrin's estate shall be charged with all damages caused by his fraudulent embarrassments of the title of J. Sibley, or those claiming through him, to an undivided half of the property; and by his wrongful withholding of the possession, and suffering the property to go to decay and decline in value, that, when clear, detailed accounts of the rents received are not rendered, H. J. Perrin's estate shall be charged with the highest rents which it may be shown the property was capable of earning, and shall be credited for repairs and improvements in no case more than they are shown by clear and satisfactory evidence to have cost, nor beyond the benefits which J. Sibley's estate derived therefrom.

"*Tenth.* Or that the court decree on what other principles the accounting in respect to this property shall proceed.

"*Eleventh.* These defendants pray that this court may decree that no bonds and mortgages or other assets of Joseph Sibley's estate were ever in fact transferred to the Bank of Michigan, or, if any were transferred, that the transfer was fraudulent and void, and that Horace J. Perrin's estate is bound to account for the income and profits of all such bonds and mortgages or other assets claimed to have been transferred.

"*Twelfth.* That this court may decree that the executor's account rendered in schedule of the amended bill is too confused, false, and fraudulent to be made the basis of a judicial investigation of this account, and the account rendered in schedule annexed to this answer be substituted in its place for that purpose.

"*Thirteenth.* These defendants pray that this court may decree that the stock, capital, and assets of the Bank of Michigan, in whosesoever names the stock stood, belonged exclusively to H. J. Perrin & Co.; that the National Bank of Michigan was a mere reorganization of the Bank of Michigan, and its stock, capital, and assets were in equity also assets of H. J. Perrin & Co.; and that all

transfers by H. J. Perrin, as surviving partner or executor, or of H. J. Perrin and Darius Perrin as surviving partners, of bonds and mortgages or other assets of H. J. Perrin & Co., to either of these banks, were not only fraudulent, but absolutely null and void; and that Horace J. Perrin's estate is bound to account for the income and proceeds of such bonds and mortgages, and other assets, as if no such transfers had ever been made.

"*Fourteenth.* That this court may decree that the surviving partner accounts annexed to the amended bill are wholly insufficient, false, and fraudulent, and that, in consequence of the fraudulent acts and omissions of Horace J. Perrin, no reliable *data* exist for making and stating such accounts, or for ascertaining with reasonable certainty the state of the affairs of H. J. Perrin & Co. at the time of Joseph Sibley's decease, or what would have been the result of the copartnership business if it had been properly wound up by Horace J. Perrin as surviving partner, though it does appear sufficiently that it would have resulted, and did in fact result, in large profits; the amount of which profits is unascertainable, and any attempt to ascertain the same would involve unreasonable and useless delay and expense; that in view of this state of things, and of the provisions of the copartnership articles, this court may decree an accounting to ascertain what capital was put into the firm by Joseph Sibley in bonds and mortgages, or other securities or money, and what interest or income was derived from the bonds and mortgages or other securities so put in, or from the securities which may from time to time have been substituted for any of them; and that in the accounting Horace J. Perrin's estate, or the complainant as its representative, be charged with the amount of such securities so contributed, and the interest and income thereof, and of any such substituted securities, and also with interest at the rate of ten per cent., compounded on any cash capital so contributed by Joseph Sibley, and the proceeds of such securities after the same have ceased to be capable of identification; and that the surviving partner account be adjusted on this basis.

"3. These defendants also pray that a receiver may be appointed by this court to take possession and charge of all the property and assets of Horace J. Perrin and of H. J. Perrin & Co., and of all books and papers relating thereto.

"4. And that such receiver be directed to pay out of such property and assets, or the income thereof, all the reasonable expenses of the accountings prayed for by the amended bill, and in this answer, which have been or may be incurred by the respective parties to such accounting, the accounts for such expenses to be audited as this court shall direct.

"5. And that these defendants may have such other and further

relief in the premises as the circumstances may require, and to this honorable court may seem meet.

"ANNA LOUISA FISK.

"S. V. R. LEPPER,

"Administrator, etc."

Darius Perrin filed his separate answer, wherein he says he was a partner with Sibley and Horace until Sibley died, and indorsed their paper for large sums of money, and assisted the firm by his personal service much of the time; that Mann, Powell, Dibble, and Frink, the persons appointed executors with H. J. Perrin by Sibley of his will, declined to accept the trust or qualify, and that their declination was procured by H. J. Perrin, so that he could alone administer the estate under the will.

He avers that H. J. Perrin's conveyances of land to his daughter Caroline are valid, and that she intends to hold the land; that Joel J. Perrin, administrator, has entirely withheld from him the books and papers of the firm; has refused to allow him to inspect them since the death of Horace.

Denies, upon information and belief, that Horace put into the firm, as capital when it was formed, over $40,000. Avers a profit was made in the company business, and no great loss was sustained in any portion thereof.

He further avers that himself and Horace carried on the business in which the firm was engaged, the same after as before Sibley died, as surviving partners, but that Horace had all the management of the business; that all the books and papers of the firm were in Horace's hands when Sibley died, and were afterwards kept under his exclusive direction and control, and he managed and manipulated the keeping of said books and accounts, and the entries made therein, as he saw fit, and defendant could not get him to render an account of the assets and liabilities of said firm at any time.

The defendant avers that the business of the partnership was in a flourishing condition, and making money, —accumulated large profits in the business; and that Horace continued to make statements to that effect to the defendant, until Francis M. Sibley filed his bill against Horace for an accounting, and to obtain his father's estate, and then he proclaimed the firm insolvent to Francis and others, and which was not true, and, as he avers, Horace commenced about that time his fraudulent practices of various kinds to appropriate the firm assets to his own use. And further says the Bank of Michigan was owned by the firm, and that its books contained numerous transactions of the firm from time to time, relating to its other business as well as that of the bank; that he never, to his knowledge, joined in the transfers of the firm property to the Bank of Michigan, or to the National Bank of Michigan; that all such transfers are void, and were procured by Horace J. Perrin.

He denies that the firm at any time owed $700,000, or any sum, over and above its bills and accounts receivable, and if the books show such a state of things at any time it is because of false and fraudulent entries made therein, or caused to be made, by H. J. Perrin in his life-time.

He denies that any of the schedules attached to the complainant's amended bill are correct or truthful, and he believes his share of the profits of said firm will, upon a fair and honest accounting, amount to $50,000; and further denies that the firm is indebted to H. J. Perrin's estate.

Darius Perrin, further answering, says that, during the continuance of said firm, H. J. Perrin had the principal charge and management of its business operations, and of the keeping of the accounts, and that no business of importance was transacted without his knowledge, con-

sent, and approval, and that said Horace, in the life-time of Sibley, and for several years thereafter, frequently and at all times informed him the firm made large profits, and never told him otherwise, until Horace conceived the idea of defrauding the Sibley estate of its portion of the assets of the firm, and the profits thereof, and to that end he—

"Manipulated the keeping of the accounts of said copartnership after the death of said Joseph Sibley,"—

And fraudulently attempted to appropriate all the assets to his own use, to defraud him and the Sibley estate; that he not only made false and fraudulent entries upon the books of account, but intermingled the assets of the firm with the individual assets of Joseph Sibley's estate, also, by the destruction and concealment of books of account and papers belonging to and relating to the business of the firm, and by the fraudulent mutilation of such books and papers, and by fraudulent changes of dates, items, and amounts; and for the ways and means of accomplishing such fraudulent purpose and design he refers to those given in Lepper's and Mrs. Fisk's answer in this case; and, so far as they relate to the fraudulent entries upon the books of account of said firm, or of matters relating to the assets of the firm, upon information and belief he charges the same to be true, and that no separate accounts of Sibley's assets, or the company's assets, or of H. J. Perrin's, or of his and Horace's assets, was ever kept, but that they were all kept and commingled together, and he is informed and believes that no inventory was ever made or kept showing the individual property and that of the company, and that no attempt was ever made to make such accounts, or an inventory by Perrin or his administrator, until the filing of the bill in this case.

Further answering, he says the Bank of Michigan

belonged to H. J. Perrin & Co.; that its books contained numerous entries of the transactions of the firm from time to time, and of other matters, as well as those relating to the transactions of the bank; that he is denied all access to the books of the Bank of Michigan; and he avers that all the transfers of the property of the firm to the Bank of Michigan, or to the National Bank of Michigan, were without consideration, and were procured by H. J. Perrin to cheat and defraud the defendant and estate of Joseph Sibley, and that he had no recollection of ever participating in any such transfers, that the National Bank of Michigan was but the successor of the Bank of Michigan, and that its bonds were purchased by Horace with the property of the firm, and he held its assets in trust for the firm when he died; that its stock, in whosesoever name it stood, was all owned by Perrin, and he received the income from the same; that the books of the Bank of Michigan were not burned, but suppressed, and that he saw them, and saw H. J. Perrin examine them, since the fire.

He further says they contained much information about the company's business which is not obtainable from any other source; that, as surviving partner, he has asked J. J. Perrin, Horace's administrator, for the books of the firm and the bank, but he refuses to allow defendant to take or inspect them.

This defendant prays the benefit of a cross-bill from his answer, and for an accounting, and that his interest may be ascertained and paid, and for a receiver, and for general relief.

Caroline Perrin answered the amended bill, and therein denies that Horace was the owner of certain lands at the time of Joseph Sibley's death, and which were deeded to her by Horace, and also denies that Horace was ever mentally incompetent to do business, and states that a

suit is now pending in the federal court, at Detroit, between the heirs of Horace J. Perrin, as the complainants, and defendant, to test the validity of her deed, upon the ground of alleged incapacity of Horace, and fraud, and undue influence.

Says J. J. Perrin, as administrator, has colluded with the other heirs of Horace, and has destroyed an unrecorded deed made to her by Horace. She also denies that the firm at •Sibley's death held the title to, or were the owners of, any real estate deeded to her.

She denies that Horace or Joel acquired any title to any of the lands by foreclosure of mortgages after Sibley's death, and avers that all proceedings had for that purpose were fraudulent and void; and she further claims that, as to the matter of accounting and settlement of the affairs of the firm of H. J. Perrin & Co., or of H. J. Perrin's executorship of the estate of Joseph Sibley, or with the assets of the Sibley estate, they are matters relating to which the defendant ought not to be joined with the defendants in this suit; and claims the benefit of a demurrer for that cause, as well as for multifariousness; that no case is made against her in the bill. She denies all fraud and confederacy, and asks that the bill may be dismissed as to her.

Elizabeth C. Perrin made ·her separate answer, and says that she is informed and believes Horace J. Perrin foreclosed the mortgage against L. C. Kellogg, and took a decree for $25,000, and sold the property thereon, and bid it off in her name at the sale for about $6,000, and had the deed. made to defendant about August 26, 1878; that she paid nothing on the bid, and knew nothing of the transaction at the time. She further says, on the 26th of December, 1878, she gave a mortgage for $12,000 to Horace, at his request, running to the firm of H. J. Perrin & Co.; that said mortgage was not intended to create

any indebtedness of hers, and should be delivered up and canceled, and that she is ready to receive the same, and convey the property to whomsoever it may belong; and, as to anything else contained in the bill, she is not interested, and is a stranger thereto, and should not be required to answer, and ought not to have been joined as defendant, and claims a demurrer.

She prays the benefit of a cross-bill, and by decree she may be directed to convey the Kellogg property to such persons as the court shall find entitled to the same; and that she may be released from all liability if any on account of giving said mortgage, and note accompanying the same.

She denies all confederacy and fraud with which she is charged, and asks to be dismissed, with her reasonable charges.

The Sibley heirs to the number of 42, filed their joint and several answer, on the 21st day of May, 1885. They in substance affirm that the Lepper and Fisk answer is true, and aver, upon information and belief, that J. Sibley's capital at the time of his death, in the firm of H. J. Perrin & Co., was the sum of $250,000; that Darius was never a partner, nor had he any interest in said firm, and that his claim now put forth as such partner is only for the purpose of defrauding and assisting Horace J. Perrin's estate in defrauding the estate of Sibley, and absorbing its property; and that all the schedules attached to complainant's amended bill are incorrect, false, and fraudulent.

In view of what has already been said, it will be unnecessary to notice further the case of these Sibley heirs. After this, the issue was joined by the filing of the usual replication to these several answers.

On filing the answer of Lepper and Fisk, and on the 1st day of April, 1884, they applied to the circuit judge;

for the appointment of a receiver. Darius Perrin also made a similar application June 2, 1884. The circuit judge, on the 3d day of September, 1884, decided that a receiver be appointed, and on the 9th day of October made the following order appointing John Houston, of Marshall, in the county of Calhoun, such receiver:

"This cause having been brought on for hearing upon the joint motion of the defendants Stephen V. R. Lepper, administrator of the unadministered estate of Joseph Sibley, deceased, and Anna Louisa Fisk, individually and as executrix of Francis M. Sibley, deceased, and the separate motion of the defendant Darius Perrin, for the appointment of a receiver of the property and assets of the late firm of H. J. Perrin & Co., and of Horace J. Perrin, deceased, and having been heard upon the pleadings, affidavits, books of account, and other documentary evidence adduced by the respective parties, and having been argued by the respective counsel for the complainant, and the moving defendants, and their arguments having been duly considered.

"And it appearing to the court, amongst other things, that October 11, 1858, Horace J. Perrin and Joseph Sibley entered into copartnership under the name of H. J. Perrin & Co., upon the terms alleged in the first paragraph of the complainant's amended bill; that the defendant Darius Perrin, on April 30, 1859, became a partner in said firm; that this firm continued to exist, and to do a large and apparently successful business, until September 7, 1864, when it was dissolved by the death of Joseph Sibley.

"That on Joseph Sibley's decease Horace J. Perrin, as surviving partner, assumed the control and management of the partnership affairs, and took possession of the partnership property and assets, and its books and papers; that soon afterwards he was appointed executor of Joseph Sibley's estate, and in that capacity took possession and control of the individual property and assets of that estate, and its books and papers; that he did not proceed with due diligence to wind up the partnership affairs, and complete the administration of Joseph Sibley's estate, but neglected and refused to do so for sixteen years and upwards; that he made no inventory of the property and assets which came into his hands as surviving partner, and kept no proper surviving partner or executor account, or, if so, they have not been produced.

"That he continued, after the decease of Joseph Sibley, to carry on business with the partnership property and assets, and to some extent the individual assets of Joseph Sibley's estate, and the income and proceeds thereof, either in the name of H. J. Perrin & Co., or

in the name of the Bank of Michigan,—an institution organized by
H. J. Perrin & Co., under the general banking law of Michigan, and
which was owned by and an asset of the firm,—or in the name of
the National Bank of Michigan, which was the Bank of Michigan
reorganized under the general banking law of the United States, or
in his own name, until his decease.

"And after a time on various false pretenses, and by and through
various fraudulent devices, he acquired, or claimed to have
acquired, a color of title to a large share of the said assets, and
fraudulently claimed and dealt with them as his own, discharged of
the trusts upon which he held them as surviving partner and exec-
utor, and so dealt with them, and changed their form, and com-
mingled them with his own property, that apparently they have for
the most part become incapable of specific identification.

"That Horace J. Perrin died on January 11, 1880, without having
wound up the partnership affairs, or accounted, either as surviving
partner or executor, or ever rendered any clear or intelligible
account of his doings in either capacity.

"That soon after Horace J. Perrin's decease the complainant was
appointed administrator of his estate, and the defendant Lepper
administrator de bonis non of the estate of Joseph Sibley; that the
complainant, as such administrator as aforesaid, came into the pos-
session and control of the personal estate of which Horace J. Perrin
died possessed, and his books and papers, and the books and papers
of H. J. Perrin & Co., and of Joseph Sibley, and the other books
and papers containing information in respect to Horace J. Perrin's
dealings with the property and assets of H. J. Perrin & Co., and of
Joseph Sibley's estate; that the property and assets of which he so
came into the possession included a large amount of the assets of H.
J. Perrin & Co., and of Joseph Sibley's estate, or the income and
proceeds thereof, commingled with Horace J. Perrin's own property
in the manner before stated.

"That the complainant is one of the heirs at law of Horace J.
Perrin, and as such his interests are adverse to the claims of the
moving defendants; that he has not used due diligence in ascertain-
ing, from books and papers in his possession and control as adminis-
trator, the facts in relation to Horace J. Perrin's administration of
the affairs of H J. Perrin & Co. and of Joseph Sibley's estate, and
rendering clear and intelligible accounts thereof; that in and by his
amended bill in this cause, and the accounts annexed thereto, he has
claimed the benefit of, for his intestate's estate, most of the devices
by which his intestate sought to appropriate assets of H. J. Perrin &
Co. and of J. Sibley's estate, as hereinbefore mentioned; that the
accounts of Horace J. Perrin's administration of the affairs of H. J.
Perrin & Co., and those of Joseph Sibley's estate, annexed to the

complainant's amended bill, are so obscure, defective in method, deficient in detail, and so erroneous, as to be unfit basis for judicial investigation; that the complainant has denied to the defendant Darius Perrin all access to the books and papers of such firm; that the books and papers of the Bank of Michigan, which contained the only original record known to have been made of the dealings of Horace J. Perrin, with most of the property and assets of H. J. Perrin & Co., and of Joseph Sibley's estate, between October 19, 1864, and January 1, 1866, are not produced; that the private ledger of Horace J. Perrin, covering the period prior to 1870, containing like records, was not produced for the inspection of the defendants Lepper and Fisk until after great delay, not satisfactorily explained, and before its production had been in various parts fraudulently mutilated by Horace J. Perrin, or some other person.

"It is now, by the court, ordered, adjudged, and decreed that John Houston, of Marshall, Calhoun county, Mich., be, and he is hereby, appointed receiver of all the property and assets now remaining, and capable of identification, which belonged to the late firm of H. J. Perrin & Co., or to the estate of Joseph Sibley, deceased, and also all the personal property and assets of the estate of Horace J. Perrin, deceased; that said John Houston file security in the usual form in such cases, with sureties to be approved by the judge or register of this court, upon a motion of six days, with names of sureties proposed, and in the penal sum of three hundred thousand dollars, for the faithful performance of his trust, and upon the filing of such security in the office of the register of this court such receiver will have all the powers and authority of receivers in like cases; that said complainant assign and deliver over to such receiver, under the direction of one of the circuit court commissioners of this county, to whom it is referred, all the property and assets of the firm of H. J. Perrin & Co., or of the estate of Joseph Sibley, deceased, or which belonged to said firm, or to said Joseph Sibley, at the time of said Joseph Sibley's decease, and all books and papers belonging to said firm, or to Joseph Sibley's estate; also all other books and papers containing any information in respect to Horace J. Perrin's dealings with the property or assets, and the liabilities of said firm, or of said estate of Joseph Sibley; also all the assets of the estate of Horace J. Perrin, and all books and papers belonging to his estate, so far as the aforesaid property, assets, books, and papers have come into his possession or under his control; and that he appear before said commissioner from time to time, and submit to examination on oath in relation to any such property, assets, books, or papers, and the assignment and delivery thereof to such receiver, according to the rules and practice of the court; and it is further ordered that either of the parties hereto, as well as said receiver, have leave to apply to

this court for such further and other directions in the premises as may from time to time seem advisable and necessary.

"FRANK A. HOOKER,
"Circuit Judge."

From this order the administrator of H. J. Perrin's estate took an appeal to the Supreme Court, where the order of appointment made by the circuit judge was so modified and restricted in its application as not to apply to any part of the property claimed as belonging to the estate of Horace J. Perrin. This modification was made April 15, 1885. See *Perrin v. Lepper,* 56 Mich. 351 (23 N. W. Rep. 39).

On the 29th day of January, 1886, the circuit judge made the following order:

"In this cause, on reading and filing motion of the complainant, and for a general reference to a commissioner to take proofs in this cause, and on due consideration thereof, and of the cross-examination of the defendants Lepper and Fisk, duly entered herein, for a hearing in open court the preliminary questions of fact necessary to be determined to fix the principles of the several accountings, such preliminary questions to be recited in the order for such hearing; and on motion of M. J. Smiley, solicitor for complainant, Wm. H. Porter, solicitor for defendant Lepper, and S. T. Douglass, solicitor for defendant Fisk, opposing said order, but consenting that, if entered, George Gatrell, a notary public, may be substituted in such order for any circuit court commissioner; and further consenting to so much of said order as relates to the enlargement of the time,—ordered that it be referred to said George Gatrell to take proof, and report the same to this cour*, relating to the matters in controversy between the parties necessary or proper to be determined for the purpose of ascertaining and determining the principles upon which the accountings in this cause, or any of them, shall proceed.

"That the time for taking such testimony shall be limited to ninety days from date hereof, and may be enlarged either by the court, or the judge at chambers on cause shown, or the application of either of the parties, with a bond that, upon the filing of the proofs taken by the commissioner, either party may notice the cause for hearing for the purpose of obtaining a preliminary decree as to the principles for such accounting.

"FRANK A. HOOKER, Circuit Judge."

Under this order, all the proofs in the case have been

taken, and which number nine or ten thousand pages, and upon which, and the pleadings, the cause was heard before Judge Hooker, in the Calhoun circuit, who, on the 7th day of October, 1887, entered the following decree:

"Decree in case of Joel J. Perrin, Administrator, etc., v. S. V. R. Lepper, Administrator of the Unadministered Estate of Joseph Sibley, Deceased, et al.

"That Horace J. Perrin and Joseph Sibley, on October 11, 1858, became partners under the articles of copartnership set forth in the amended bill of complaint in this cause; that on April 30, 1859, in accordance with the provisions of the eighth of said articles, Darius Perrin was admitted to the said partnership, and that on said 30th of April, 1859, said H. J. Perrin and Joseph Sibley executed the agreement, admitting said Darius to said partnership, set forth in said amended bill, and that thereafter said Darius Perrin continued to be a member of said firm until the dissolution thereof; that on July 31, 1861, said copartnership was renewed by an agreement in writing, signed by said H. J. Perrin and Joseph Sibley, as alleged in said amended bill of complaint, and assented to by Darius Perrin, although not signed by him; that Joseph Sibley contributed to the capital stock of said firm the securities described and set forth in Schedule E, attached to said amended bill; that Joseph Sibley died September 7, 1864, and said firm thereby became dissolved; that said Joseph Sibley executed the last will and testament and codicil, described and set forth in said amended bill; that the same was duly admitted to probate as therein alleged, and that of the executors named therein H. J. Perrin alone qualified, and became sole executor thereof; that as to the residuary portion of his estate said Joseph Sibley died intestate, and such residuary portion became vested in Francis M. Sibley, and that his title thereto was never divested under the fourth clause of said will.

"That no portion of said estate ever became vested in any of the defendants known as the Sibley heirs, to wit, Orrin Sibley, Maria Drake, Mary Churchill, Hannah Field, Adalade Sill, Clark C. Sibley, Pattie Hare Newcomb, Marriett Smith, Wakeman Sibley, Phillip Sibley, James R. Sibley, Jane Sibley Smith, Ella P. Bork, Bushnell B. Carr, Amanda Crocker, Anna P. Cummings, Mary Sophia Hulett, Henry C. Ramsdell, Mary E. Vilas, Jonathan Sibley, Frank Sibley, Mary Ann Prenttice, Juliet Gardinier, Chas. Sibley, Clark C. B. Sibley, Frank Shadbolt, Henry Shadbolt, George Shadbolt, Mollie Shadbolt, Julia Drummond, Lucian Sibley, Joseph C. Sibley, Henry Sibley, Mrs. Chas. Miller, Mrs. E. F. Crane, Margira Sibley, Wm. A. Sibley, Irving Sibley, Amelia Waite, Austin Agard, and John Sibley.

"That Francis M. Sibley died November 30, 1870, having devised and bequeathed his entire estate to the defendant Anna Louisa Sib-

ley, now Anna Louisa Fisk; that defendant Lepper is the duly qualified administrator of the unadministered portion of Joseph Sibley's estate; that upon the dissolution of the firm of H. J. Perrin & Co. by the death of Joseph Sibley, on September 7, 1864, all of the accounts and other assets and property of said firm came into the possession and control of H. J. Perrin as surviving partner; that during his lifetime the said H. J. Perrin neither kept nor rendered to Francis M. Sibley, nor to any representative of the Sibley estate, nor to any person entitled thereto, any true or honest account of his dealings with the assets and property aforesaid, as surviving partner, but willfully and fraudulently refused and neglected so to do, and was otherwise guilty of gross fraud and misconduct in his capacity as trustee, both as surviving partner and executor; that said H. J. Perrin died January 11, 1880, and that the complainant was afterwards duly appointed administrator of his estate, as set forth in the amended bill; that none of the schedules attached to complainant's amended bill contain a true account of H. J. Perrin's doings as surviving partner, and the same are not a proper basis for an accounting; that no true account of H. J. Perrin's doings as surviving partner has been furnished to defendants Lepper and Fisk, or either of them, or to any person interested in said Sibley's estate, by the complainant, Joel J. Perrin.

"That after the dissolution of said firm of H. J. Perrin & Co., by the death of Joseph Sibley, on September 7, 1864, and down to October 19, 1864, said H. J. Perrin continued to carry on the business of said firm as before the dissolution, and kept and recorded his doings in that regard on the firm's books; that on October 19, 1864, said H. J. Perrin, by sundry devices and means, attempted to conceal and convert to his own use the assets of said firm, and after said October 19, 1864, said H. J. Perrin did convert to his own use the assets of said firm, the proceeds and income and profits thereof, and did traffic therewith, and make large gains and profits therewith: and, because of H. J. Perrin's fraud and misconduct, it is now impossible to ascertain with accuracy the value of said assets or profits made therewith, or the increase thereof, but that such assets earned large profits in the hands of H. J. Perrin.

"And thereupon the court orders, adjudges, and decrees that the administrator of said H. J. Perrin's estate, said Joel J. Perrin, do account to the said S. V. R. Lepper, administrator of Joseph Sibley, for the value of Joseph Sibley's interest in the firm of H. J. Perrin & Co., as of October 19, 1864, and that such value be determined as hereinafter directed.

" And it is further adjudged and decreed that the several agreements executed by Francis M. Sibley, with reference to the real estate owned in common by Joseph Sibley and H. J. Perrin, set forth in the amended bill, and therein designated as number one, number two, number three, number four, number five, and number six, were

fraudulently obtained by H. J. Perrin, and are, and each and every one of them is, null and void; that the estate of Joseph Sibley was entitled to receive one-half of the rents, profits, and income of said real estate after said Sibley's death, but that the whole of such rents, income, and profits was received by H. J. Perrin, and that said H. J. Perrin never kept or rendered any true or honest account thereof to Francis M. Sibley, or to any representative of Joseph Sibley's estate, or to any person interested therein; that, if a true account of the same was ever kept, the same has been suppressed or destroyed, and is not produced, and that, by reason of the fraudulent acts by H. J. Perrin aforesaid, no true or accurate account has been or can now be made up.

"Thereupon the court decrees that $30,000 be fixed as the value of Joseph Sibley's interest in said real estate as of the day of his death, September 7, 1864, and that 7 per cent. interest thereon from said September 7, 1864, to January 11, 1880, be fixed as the value of the share of Joseph Sibley's estate in such rents, profits, and income; and that, in addition thereto, the Sibley estate is entitled to one-half of the insurance money received by H. J. Perrin in 1867, on buildings and improvements on said property then destroyed by fire.

"It is further ordered, adjudged, and decreed that an accounting be had of the partnership affairs, and of the value of Joseph Sibley's interest, as well as that of the other partners in the firm, as of October 19, 1864, and of the rents, profits, and income of the tenant in common property, and of the proceeds of the individual estate of Joseph Sibley, received by H. J. Perrin as executor, all in accordance with principles of this decree, and that upon such accounting the parties proceed as follows:

"Each party shall, on or before the 12th day of November next, make up and file with the register a plain statement of the firm's assets and debts as of October 19, 1864, showing all of the assets then owned by the firm, and every item thereof, and the value of each item as nearly as the same can be stated, according to his best information and belief (but such statement shall not include any accounts or claims against either of the partners), and the various items of indebtedness then due and owing by said firm to persons other than partners, and the several amounts actually paid out in discharge of such indebtedness, and when and how paid, as nearly as the same can be stated, according to his best information and belief. Such statement shall exclude all fictitious and merely offsetting assets of debts, and shall be confined to a statement of actual assets and actual debts.

And each party shall, within the same time, likewise make up with the register a plain statement of the account of the H. J. Perrin & Co. with H. J. Perrin, as of October 19, 1864,

showing all the items proper to be charged or credited to said H. J. Perrin of that date, whether included in the account of said H. J. Perrin on the books, or in any other account on the books or otherwise; and shall within the same time make up and file with the register a like statement, according to his best information and belief, of the proper items of charge and credit, to the account of Joseph Sibley, and of Darius Perrin, of the same date; and shall within the same time make up and file a plain statement, showing all sum and sums and property that came to the hands of H. J. Perrin, either personally or through the Bank of Michigan or National Bank of Michigan, or by complainant, from the assets comprising the individual estate of Joseph Sibley, and all payments and expenditures lawfully incurred by said H. J. Perrin in the administration of said estate, and the value of the same on the 1st day of January, 1866.

"That, at the expiration of such time, it will, if deemed necessary by the court, on application of either party, on notice of ten days, be referred to a commissioner to be then named, to take and report and account as to any and all items on which the parties disagree, and either may offer in evidence, under the direction of the court, and the testimony already taken shall be considered in the decision of all disputed questions, with the same force as if taken again on such accounting. Such application may be made and heard by the judge of said court sitting at chambers, and the order there made shall have the same force and effect as if made at term.

"In making up the statements aforesaid, and in taking the account, the following principles shall govern:

"1. The assets of said firm, and the value thereof, on the 19th day of October, 1864, shall be ascertained.

"2. The debts owing by said firm on that day, to persons other than the partners, should be ascertained, and the amount determined, and which of the same were actually paid; also what, if any, are now valid, outstanding against said firm.

"3. The amount of the capital account of each partner on said day, including simple interest at 7 per cent.

"4. The amount of the $65,000 check should reduce the capital account of Joseph Sibley to the extent that it overdrew his special deposit account.

"5. The difference between the sum of the capital accounts of H. J. Perrin and Joseph Sibley, and the surplus of assets over debts, shall be called profits. Of such profits as were earned by said firm before April 15, 1859 (if any), one-half shall be credited to H. J. Perrin, and one-half shall be credited to Joseph Sibley; of profits subsequently earned, one-third shall be credited to each of the three partners.

"6. The sum of Sibley's capital account, and his share

profits, shall be taken as the value of his interest on said 19th day of October, 1864.

" 7. At the time of Sibley's death, said firm was the equitable owner of certain real estate designated in the record as follows, viz.: 'The Tillotson Farm' and 'The Etheridge Lot,' title to which was taken, and then stood in the name of H. J. Perrin & Co.; the 'Tillotson Mill,' the 'Mason Farm,' and the 'Marshall House Property,' title to which was taken, and then stood in the name of H. J. Perrin and Joseph Sibley. The Tillotson farm, was taken, and then stood, subject to a mortgage to one Ramsdell, which mortgage was allowed to be foreclosed subsequent to Sibley's death, and the title taken in the name of Darius Perrin. A portion of the same has since been sold, and the proceeds of such sale should be accounted for, to said firm, by said Darius Perrin, if he has not already done so. The remainder is still held by him, and should be treated as property held in trust for said firm, subject to division, if not required for partnership purposes. The rents and profits should also be accounted for by the person who has received them. The legal title to the Etheridge lot having been conveyed by H. J. Perrin to Caroline E. Perrin by his deed, and the title to the Tillotson mill and Mason farm being vested in her through unnecessary and fraudulent foreclosures without consideration, the Sibley estate should be permitted to exercise the option of requiring a deed from said Caroline E. Perrin of the undivided one-third of said premises, or of treating the conveyances as conversions by said H. J. Perrin at the respective dates of the several conveyances. The effect of the exercise of this right upon the accounting is plain, and need not be further stated. The legal title to the Marshall House property having been taken in the names of Perrin and Sibley, the deed to Caroline E. Perrin was ineffective to pass the half vested in Sibley. This is now vested in defendant Fisk. One-third of this half would properly belong to Darius Perrin, if not required for the purposes of the firm.

" 8. In estimating the value of the assets, the claim against L. C. Kellogg shall be taken at the amount due from said Kellogg to the firm, less his credits, on the 19th day of October, 1864.

" 9. The Herndon Hotel contract shall be stated at the face value thereof at that date, and the value of the Herndon Hall shall be fixed by the amount of proceeds (net) thereof, with proper discount back to that date.

" 10. Without further proof, the credit balance in favor of Perrin & Gilbert shall not be treated as a liability, nor shall the debit balance in favor of C. T. Gilbert be treated as an asset.

" 11. In estimating the assets of the firm, all personal property on hand at that date, whether in the actual possession of the firm, or its members, in transit, or in the hands of agents, servants, consignees, or lessees, should be included at its true value; and all advances or

indebtedness on account of such property should be treated as liabilities. The value of the wool charged in the A. T. Vary account should be fixed at the amount of the entire proceeds thereof, less such sums (if any) as shall be shown to have been actually and legitimately paid to said Vary for money advanced, or by way of his share of the profits of such transaction, of which he was entitled to one-half; all to be discounted to October 19, 1864.

"12. There was no binding agreement to pay a salary to H. J. Perrin, and no allowance should be made therefor.

"13. The claim of complainant, in relation to the Eau Claire Bank, is not sustained by the proof, and items 1,733, 1,734, and 1,735 of H. J. Perrin's account in complainant's Exhibit 163 (Van Vliet's Ledger) shall not be allowed as credits to H. J. Perrin, nor shall any interest thereon be allowed.

"14. The alleged deed of the bank building from H. J. Perrin to the Bank of Michigan, which purports to have been made in 1862, was not in fact executed until 1865, and no interest on the alleged purchase price of $16,000 should be credited or allowed to H. J. Perrin.

"15. Without further proof than the mere production of the same, the Sibley check of $2,132 should not be treated as payable to H. J. Perrin.

"That the Bank of Michigan, the State Stock Bank of Eau Claire, and the three Illinois banks referred to in the answer of Lepper and Fisk, were assets of the firm, and should be treated as such, and the checks of the firm and individual partners given for stock of said Bank of Michigan shall not be treated as liabilities.

"The value of the interest of Joseph Sibley as of October 19, 1864, in said firm, having been ascertained according to the principles of this decree, interest shall be computed thereon at 7 per cent., with annual rests, from said October 19, 1864, to January 11, 1880, and to the principal and interest thus ascertained shall be added a sum equal to 7 per cent. interest on $30,000 from September 7, 1864, to January 11, 1880, plus one-half of the insurance money received in 1867 on the buildings and improvements on the tenant in common property then destroyed by fire; and also the balance, if any, due from the Perrin estate to the Sibley estate on the value as of January 1, 1866, of the individual estate of Joseph Sibley that came to the hands of H. J. Perrin, over and above his lawful expenditures as executor, together with interest computed thereon at 7 per cent., with annual rests, to January 11, 1880, and the aggregate of these sums shall constitute a new principal, which, together with interest thereon at 7 per cent. to the date of this decree, shall constitute the sum for which the estate of H. J. Perrin is liable to the estate of Joseph Sibley.

"On the coming in of said report, such further proceedings shall be had as shall be agreeable to equity and good conscience.

"FRANK A. HOOKER,
"Circuit Judge."

From this decree the complainant and all the defendants, except Darius Perrin and his two daughters, Caroline and Elizabeth, took their appeal to this Court. The cause was heard at the last January term. All the parties were represented upon the argument, which was able and exhaustive. In our examination of the record, we have been aided by over 1,400 pages of briefs, in which all the various features of the case are ably discussed. We have given the case a patient consideration, and in our examination have given careful attention to the points made by counsel, and to the testimony presented in this enormous record, and upon such examination we are satisfied that most of the material facts charged and averred in the answer of defendants Lepper and Fisk, and which are in support of the cross-bill, are true, and supported by the circumstances and proofs.

The articles of copartnership required that Horace J. Perrin and Joseph Sibley should each contribute an equal amount of capital. The amount to be contributed by Joseph Sibley was in bonds and mortgages, and he furnished to the firm in such securities $103,806.39. The amount furnished by Perrin is not stated in the articles. He was, however, allowed to contribute notes, bonds, and mortgages, if he desired to do so. Each party was to guarantee the amounts furnished to the firm in paper. The capital that each furnished was to be entered on the company books, and each was to receive credit thereon for the interest the securities furnished by him drew, until they were paid, and after that 7 per cent., and upon dissolution each party was to receive back from the firm such securities furnished by him as remained uncollected.

They required that the profits and losses should be shared equally; that each party should give his time and labor to the firm, so far as was needful to make its business a success; that neither party should draw from the funds of the firm a greater sum than $1,000 per year, on which he was to be charged 7 per cent. per annum; that Darius Perrin might become a partner if he wished to, by allowing the use of his name as joint-partner under the articles of copartnership (sharing in the profits and losses).

They required regular and accurate books of account to be kept of all the transactions of the firm, to which both parties should have free access; and quarterly, in each year, an account of stock was to be taken, and a balance was to be struck showing the profits and losses of the preceding quarter; and, at the termination of the partnership, the business of the firm should be closed by the survivor as soon as it could be, proper regard being had to its interest, and a true account rendered and settlement made by him, as soon as practicable, with the legal representative of the deceased.

H. J. Perrin took upon himself the management and control of the business of the firm as soon as it was organized, and continued it as long as the firm existed. At Sibley's death he assumed, whether rightfully or not, all the trusts cast upon the executors in Sibley's will.

Preliminary to the argument, counsel for Darius, Caroline, and Elizabeth Perrin made a motion to dismiss the appeals taken, on the grounds that the order appealed from was merely preliminary and interlocutory, and not a final order, except as to the Sibley heirs; that—

"No order to take proofs in the cause, relating to the general merits of the respective controversies, had ever been entered;" and that "such proofs have not been taken, unless they are embodied in the mass of testimony taken under the order of reference above referred to."

We do not think, under our previous decisions and the practice, this motion can be sustained. Substantial rights are affected. The Sibley heirs' claim was disposed of entirely. Claims were made against the Perrin estate for large amounts, which, under the order, were rejected, and claims made by the Perrin estate were heard, and to a very large amount rejected, by the decree appealed from. The order of the circuit court as to these was in its effect a final deposition thereof, and, when such is the effect, the order or decree is always regarded as appealable. It is the effect and not the form of the order or decree, or the particular classification of the same, which determines the question of whether or not it is appealable.

Whenever a substantial legal right is divested by an order or decree in a court of chancery, an appeal lies from such order or decree to this Court, to determine the legality of such proceedings; and we have no question but that the order made in this case, and from which the appeals are taken, is appealable. *Barry v. Briggs*, 22 Mich. 201; *People v. Simonson*, 10 Id. 335; *Lewis v. Campau*, 14 Id. 458; *Kirby v. Ingersoll*, 1 Doug. 477; *Heath v. Waters*, 40 Mich. 457, 466; *Bullard v. Green*, 9 Id. 222; *Smith v. Walker*, 57 Id. 456–488 (22 N. W. Rep. 267). See, also, *Callanan v. Shaw*, 19 Iowa, 183; *Thompson v. Pickel*, 20 Id. 490; *Oatman v. Bond*, 15 Wis. 20.

Regarding the effect of the order of reference, and what was intended by it, and what has really been done under it, more will be said further on. How it is to be construed depends, to some extent, as to what construction the parties and court placed upon it, and how they have treated it in the progress of the cause. The record shows that the amount of capital furnished by Sibley was entered upon such books as were kept, but H. J. Perrin's was not, and no statement upon the com-

pany. books was ever made, showing when or in what
amount any capital was furnished to the firm by H. J.
Perrin; that he never made any inventory of the property
of the firm, nor took an account of stock, or made any
statement showing the condition of the firm, or made any
balance showing the profit or loss in its business, during
its entire existence.

When H. J. Perrin became executor of the will
of Joseph Sibley, he was made the trustee of his
entire estate, whether individual, tenant in common, or
copartnership, as it existed at Sibley's death under these
three relations; and, in addition to these, he assumed
(whether the will gave to him or not) the guardianship
of Joseph Sibley's minor son and only child. No greater
trusts can be reposed in, nor more sacred duties assumed
by, any man in this world than were by Joseph Sibley,
lying upon his death-bed, confided to H. J. Perrin; and
it is the duty of a court of equity, when its authority is
properly invoked in behalf of those in whose interest and for
whose benefit the trusts have been created, to see to it
that such trusts are faithfully carried out, and when it
is intended to confer upon the trustee, as is claimed by
him in this case, the extraordinary duty of extending to
the *cestui que trust*—who is a minor, requiring parental
care, culture, education, counsel, and protection—the pro-
tection of a guardian, great vigilance will be exercised by
the court, when such trustee's action is brought under
review, in examining into the manner that he has dis-
charged the several and important charges committed to
him; and the court will see to it that the confidence of
the donor has not been betrayed, and that the conduct
of the donee of the trust has been honest; that he has not neg-
lected his duty or misappropriated the estate; that the estate
is preserved from diminution by the negligence, avarice,
wantonness, or fraud of the trustee; and that none of

its interests have suffered from the incapacity, dishonesty, or reckless conduct of the guardian; and will secure the proper observance of the duties assumed by such trustee and guardian, according to the well settled and defined rules which have been so long adopted, and the wisdom and justice of which have been so long established by jurists in a succession of generations, both in England and this country, that a departure therefrom has come to be regarded as a want of capacity or dishonesty in a court which fails to observe and apply them.

These rules required Horace J. Perrin, as guardian, on the death of Joseph Sibley,—

*First.* To look after the personal needs, comfort, and welfare of the only son, Francis M. Sibley; to look after his habits, his education, secure for him the best advantage for business instruction, and give him such information and insight in regard to the estate of his father, and such instructions in relation thereto, as would eventually do most in qualifying him for its successful management and control. We have failed to find in the record any attention whatever given to the discharge of these elementary duties by H. J. Perrin during his assumed guardianship, and which was not to close with the maturity of Francis, but extended about 14 years thereafter. Indeed, it would appear that he gave no attention to them at all; and that about all the interviews Mr. Perrin appears to have had with Francis were when he was making contracts with him which he had no right to make, and which in most cases required the exercise of a judgment well matured and ripened by a large business experience, relating to matters which involved the consent of the young and inexperienced boy to investments of large portions of the Sibley estate, and in which Perrin was interested against the estate, and his conduct in relation thereto tended to impoverish rather than protect

it, as it, was his duty to do. For such neglect and abuse of the trust he had assumed, no adequate compensation can now be made, and never could have been, save in part.

*Second.* These rules required that, upon H. J. Perrin's taking upon himself the duties of executor of the estate of Joseph Sibley, he should have filed in the probate court not only a true and correct inventory of the individual property and assets of the estate, but also of the tenant in common property as well as of the partnership property. The latter inventory should have shown who were the partners; the place where the firm carried on business, and the nature and character of the same; the terms of the copartnership; the capital contributed by each partner; and some statement of the assets and liabilities, so far as he knew them, or could ascertain them with any reasonable certainty. No such inventories were filed by Perrin, and such statements as were filed were incorrect, and better calculated to mislead the heir than to give him any correct information in regard to the partnership estate, or the extent thereof, or of the tenant in common property.

*Third.* They required Horace J. Perrin to enter upon a book a correct account of every piece of property belonging to the estate of Joseph Sibley when he died, showing its situation, and Sibley's interest therein; keeping the individual, tenant in common, and partnership interests each in a separate and distinct account. A debit and credit account should have been kept with each, showing, at least, the accumulations or losses, if any, in the same, annually. This he never did, but, on the contrary, kept no regular account with either of said properties, and, in such accounts as he did keep, mixed up the tenant in common, individual, and partnership interests with his own personal accounts in a confused

mass of entries, in such manner as to render it impossible for any accountant to separate the same, and to make up a true and correct statement . of account therefrom; and an inspection of the accounts and the papers which were kept by Perrin relating to Sibley's interest forces us to the conclusion .that fraudulent entries were made, and items fraudulently omitted therefrom, with the manifest intention of depriving those entitled to the estate of that which in justice and equity belongs to them; that Perrin's mode and manner of dealing with these several interests, and the property belonging thereto, both real and personal, have been in violation of every trust assumed by him in relation to the same, and that the accounts were kept in such manner, if relied upon and followed, as to give the entire Sibley estate to H. J. Perrin, and to those in whose custody he had fraudulently placed the property; and that no correct or reliable account can be made up therefrom, showing what has been done with the estate of Joseph Sibley, and its earnings. Five or six different accountants have attempted the task since the death of Perrin, and have failed to satisfy any one that the true situation of the account and the proper result has been arrived at, and several of these men are conceded experts.

*Fourth.* They required Horace J. Perrin, in the shortest time reasonably consistent with the best interest of the estate, to collect in a sufficient amount of the assets of the same to pay its just debts and the special bequests made in the will of the deceased, and to defend the estate against all unjust claims; to ascertain and collect in all outstanding claims not well secured; to ascertain and settle the net amount of the assets, and report the same, with a full account of his doings in relation thereto, to the probate court, and obtain its order for such further

disposition of the same as it might deem proper to make. Not one of these requirements did H. J. Perrin perform or observe, but, on the contrary thereof, he never collected in the claims of the estate, as he should have done. He did not pay the debts, annuities, and legacies as it was his duty to do. He did not defend the estate against unjust claims, but permitted illegal and unjust claims to be allowed against the estate, and, as the record tends strongly to show, himself attempted to make an illegal claim before the commissioners, and aided the allowance of illegal claims of others, and never made any settlement of the estate, or any correct statement or report of his doings, as such executor, to the heir or the probate court.

*Fifth.* They required H. J. Perrin at all times to keep his accounts, with the several interests belonging to the estate of Joseph Sibley, in such manner that he could, when properly called upon, be able to give to those who were interested in the estate, and especially to the heir and legatees, the situation of the estate, and all the information he could of interest to them during the progress of its settlement; and allow them, and their attorneys, who were acting in good faith, opportunities to inspect the books and papers of the deceased and of the copartnership, and all the records relating to the estate in either of its departments.

From what appears in the record, there is little doubt, we think, but that H. J. Perrin, so long as he lived, and had charge of his business, knew all about the Sibley estate, and its increase while in his hands and under his control, and could at any time, with the aid of such accountants as he had in his employ, in a reasonably short time, have given the defendants, or either of them, a comparatively accurate and correct statement of Joseph Sibley's interest. To hold otherwise would be to impeach

every witness' testimony who has testified in the case as to H. J. Perrin's business ability; and the fact that he so managed the business of the firm as to make its capital, in the period of less than 25 years, earn for its owners nearly $1,000,000, ought to be sufficient alone to satisfy any reasonable mind that he must have known who were his creditors, and the amount he was at all times owing them, and that he did not trust altogether to his memory to retain evidence of such facts.

And it is equally apparent from the record that important legal evidence of the dealings he had with the partnership property, both before and after the death of Sibley, has been either suppressed or destroyed; and that the heir is to a very great extent at the mercy of H. J. Perrin, and his representative, to make such disclosure and present such evidence of H. J. Perrin's dealings with the property of the firm while Sibley lived, and of his management and custody of the same since his death, as H. J. Perrin and his representative might be pleased to make.

The record further shows that, when the heir became of age, he could get no statement from H. J. Perrin, except that he was his guardian, clothed with absolute power, for the control of the estate, and could render no accurate account; and a few years later, when the heir made his legal demand in a court for information in regard to the estate, and for the means to supply necessaries for his family, the executor informed him that he had no estate, and that his father died insolvent; and when the heir was obliged to make resort to the proper courts to compel disclosure of facts which common honesty, and a decent respect for the dead, should have induced the trustee to make voluntarily and with pleasure, he came into court with such incorrect, deceptive, and fraud-

ulent accounts as he thought would make good his state-
ments made to the heir.

*Sixth.* These rules required him to work for the best
interests of the estate at all times; to so keep, manage,.
and invest the property of Joseph Sibley that he could,
in case of the death of Francis M. Sibley, turn it over
to the person or persons entitled within a period of 12:
months, freed from all complications with his own or the
property of others. These things he did not do. The
record shows he used the estate almost exclusively for the
interest of Perrin; that, with the exceptions of the debts
and legacies he paid, he kept, managed, invested, and
used the Sibley estate for his own use and purposes, the
same as though he was the exclusive owner thereof, and
under no trust obligations in relation thereto; and, when
young Sibley died, claimed his father's estate was not only
exhausted, but was largely indebted to him, and he had
nothing to turn over to those who could rightfully claim
the same.

*Seventh.* And these rules finally required the trustee,
upon the death of Francis M. Sibley, if he was in doubt
about the proper construction of the will, in regard to
making final distribution of the estate, to make applica-
tion to the proper court, and have the question settled,
and take its direction in the matter.

Now, it appears very clearly from the record that not
one of these several things did he do. He was beyond all
question cognizant of what was necessary for him to do
in the premises in the discharge of all his duties. He
was presumed to know the law, and we think, further, he
did know the law; for the record shows, from the very
beginning of his financial relations to these trusts and
beneficiaries, and running through the entire period
of his trust obligations, he availed himself of the

counsel and services of the ablest lawyers of the State, as well as of those outside the State, and deliberately chose to take the course he did, and manage the estate of Joseph Sibley in the manner appearing in this record. And we think that it further appears from the case, as presented to us, that Darius Perrin was the relative, and early adviser and friend, of H. J. Perrin; that, from the beginning of the business relations between H. J. Perrin and Joseph Sibley, the transactions between Horace J. Perrin and Darius show an intimacy in the conduct and modes and manner of conducting the business, up to the time of the death of H. J. Perrin, which unavoidably makes him a participant in most of the illegal and fraudulent transactions by which Mrs. Fisk had been deprived of whatever she is entitled to of Joseph Sibley's estate; and, inasmuch as he never furnished any capital to the firm of Horace J. Perrin & Co., he is not entitled now to any share of the income arising from the capital furnished to the firm by Joseph Sibley, and Mrs. Fisk should not now be troubled with the litigation, expense, and delay in ascertaining what may be the interest of Darius in the estate of Horace J. Perrin, but said estate of Darius should be left to adjust such interest as may in the future be found necessary to a proper disposition thereof.

It is also quite evident that the two daughters of Darius Perrin, Elizabeth and Caroline, are only interested in this suit through the deceptions used by Horace in covering up transactions by which he sought to absorb the estate of Joseph Sibley; at least, no other object appears in the record in transferring to them property of the company, and one of them admits in her answer that she has no interest in a part transferred to her, and is willing to retransfer the same to whom it in equity belongs, whenever the court may so order. It is quite manifest that such transfers were made and managed through some arrange-

ment and dealings between Horace and Darius, with which Mrs. Fisk ought not to be troubled, but that those matters should be left for adjustment with the estate of Horace J. Perrin, and this should be so ordered, and Mrs. Fisk be relieved therefrom. In the view we take of the case, it is unnecessary to determine, as between these two defendants and Mrs. Fisk, whether they were or not knowing to or participated in Horace's schemes of fraud, or as to any connection Darius may have had therewith.

It is now more than 24 years since Joseph Sibley died, and Horace J. Perrin took exclusive possession and control of his estate, and assumed to take control of the person of his only heir, as his guardian. During the first two years thereafter there was no one to call him to an account, and it is now more than 20 years since the heir, Francis M. Sibley, filed his bill of complaint, for the purpose of obtaining an accounting in relation to the business of said firm of H. J. Perrin & Co., and the various trusts with which he was charged by Dr. Sibley, and for the settlement of his estate; and it is averred by the complainant that H. J. Perrin's and complainant's litigation expenses in the course pursued has cost H. J. Perrin and his estate about $150,000, and which, it appears by the record, long since exhausted the property of Mrs. Fisk. Justice requires that this litigation should now be closed, so far as it can be and preserve the rights of parties, and Mrs. Fisk earnestly asks that it may be, so far as her rights are concerned upon this reference, and especially as between the complainant and Mrs. Fisk and Mr. Lepper; the merits having been fully gone into.

For over 20 years, H. J. Perrin, while living, and his administrator since his death, have been fully made aware of the claims of Sibley's estate in the premises; and it is

manifest from the record that all the testimony which can be obtained from records, or witnesses now living, has been put into the record, and, when the case was heard upon these proofs, the circuit judge had before him all that he could ever have when finally passing upon the case. In passing upon the question made under this order of reference, the court must finally dispose of the merits of the case between the Perrin estate and Mrs. Fisk. When the basis or principles of the mode of accounting are fixed, in the view we take of the case, nothing remains to be done but to compute the amount, and no further or other reference is necessary for that purpose, so far as the partnership interests are concerned; and we shall not send the case back for that, so far as it relates to Mrs. Fisk and Mr. Lepper, or the interest they or either of them represent, but make a final disposition of those interests here.

The longer we have examined this record, the more manifest it is to us that no accurate or reliable statement can be made of the accounts of the firm business, or of the balances due to the partners therein from each other, from the accounts now in existence presented by the complainant for that purpose; that important portions of the accounts of the business of that firm now remaining have been either withheld, suppressed, or destroyed, and such as have been presented to a certain extent bear evidence of mutilation, and are found to be so incorrect, false, and fraudulent as to be unfit to furnish any correct basis or *data* for an accounting; and that the efforts made for that purpose only show the correctness of this conclusion.

The complainant has summoned the defendants into a court of equity to have the liability of the estate of Horace J. Perrin to Mrs. Fisk, and the extent thereof, ascertained, and its rules will not allow it to be ascertained from such

imperfect accounting as is here presented; and when such is the case, and the amount of capital furnished by the deceased partner is known or can be ascertained with a reasonable degree of certainty, the rule that the *cestui que trust* may either follow that fund, and take the profits, or take the fund furnished to the copartnership, with such interest, in lieu of profits, computed in such manner and at such rate as will, in view of all the facts and circumstances, be in accordance with the principles of equity and justice between the parties, must be applied; and it must be held that Horace J. Perrin, in taking the course he did in the management of the various trusts committed to his charge, elected that this rule might be applied in case equity should be resorted to in the settlement of these accounts, and his heirs must abide thereby. We all think this rule should govern in this case, as it now comes before us, and, if authorities or precedents were necessary to establish the views herein taken, the following fully support the position: Pars. Partn. 433; Hill, Trustees, 816; Lindl. Partn. 668; *Millerd v. Ramsdell,* Har. Ch. 373; *Eason v. Cherry,* 6 Jones, Eq. 261; *Willett v. Blanford,* 1 Hare, 265, 269; *Case v. Abeel,* 1 Paige, 393; *Forrester v. Oliver,* 1 Bradw. 259; *Brown's Appeal,* 89 Penn. St. 139, 147; *Chittenden v. Witbeck,* 50 Mich. 401 (15 N. W. Rep. 526); *Sheldon v. Rice Estate,* 30 Id. 296; *Dwight v. Blackmar,* 2 Id. 330; *Heath v. Waters,* 40 Id. 457; *Pomeroy v. Benton,* 77 Mo. 64; *McKnight's Ex'rs v. Walsh,* 23 N. J. Eq. 136; 2 Story, Eq. Jur. § 1277; Lewin, Trusts, 361, 363, 364; 1 Perry, Trusts, § 471; *Schieffelin v. Stewart,* 1 Johns. Ch. 620; *Walker v. Walker,* 9 Wall. 743; *Hook v. Payne,* 14 Id. 252; *King v. Talbot,* 50 Barb. 453; *Hough v. Harvey,* 71 Ill. 72; *Miller v. Congdon,* 14 Gray, 114; *In re Harland's Accounts,* 5 Rawle, 323, 332; 2 Pom. Eq. Jur. §§ 1063, 1076; 2 Williams, Ex'rs, 1573; *Walrond v. Walrond,* 29

Beav. 586; *Jones v. Foxall,* 15 Id. 388; *Williams v. Powell,* Id. 461; *Diffenderffer v. Winder,* 3 Gill & J. 311; *Adair v. Brimmer,* 74 N. Y. 539; *Price v. Peterson,* 38 Ark. 494; *Eliott v. Sparrell,* 114 Mass. 404; *Jennison v. Hapgood,* 10 Pick. 77; *Ogden v. Larrabee,* 57 Ill. 389; *Walmsley v. Walmsley,* 3 Jones & L. 556. See, also, Lindl. Partn. 993; *Clarkson v. De Peyster,* Hopk. Ch. 424. See same case in 2 Wend. 78; *Insurance Co. v. Lynch,* 11 Paige, 520; *Hazard v. Durant,* 14 R. I. 25; *Cruce v. Cruce,* 81 Mo. 676; *Barney v. Saunders,* 16 How. 539; 1 Suth. Dam. 623; *Hollister v. Barkley,* 11 N. H. 511; Underh. Trusts, 178.

It is admitted by counsel for complainant that Joseph Sibley contributed, as capital to the firm of H. J. Perrin & Co., the sum of $103,806.39, consisting of money, notes, bonds, and mortgages, as required in the articles of copartnership; and that these securities were good is evidenced by the fact that there was ultimately realized from them upwards of $183,000. They mostly drew 10 per cent. interest.

We think it sufficiently appears, if we were to charge the Sibley estate with the $65,000 for half the mill property, there was still due the estate at his death, on account of the amount received on the securities contributed as his capital, about $36,000, and there still remained unpaid of these securities, principal and interest, over $97,000, besides his interest in the profits of the firm, which we have no doubt were considerable; and which sums, together with the excess of his individual estate, after the payment of the debts of the estate, and the legacies mentioned in the will, left in the hands of H. J. Perrin a sum largely in excess of Sibley's capital contributed to the firm, and we have no doubt, when we fix the sum upon which interest should be recovered at $104,000, we have done no injustice to the estate of Horace J. Perrin.

The question of what interest should be allowed, and when rests should be made in computing it, depends so largely upon the circumstances of each case that no rule can be fixed applicable in every case. When laches may be attributed, or wrongful and excessive claims are made upon the trustee by the *cestui que trust*, they become mitigating circumstances, and should be taken into account, and, though claimed by counsel for complainant in this case, we find no foundation in the record to base such claim upon. And while I am satisfied from the record in this case that the whole history of the administration of the trusts assumed by Horace J. Perrin, as surviving partner, executor, and guardian, shows a deliberate purpose, never for a moment lost sight of, to conceal, as far as possible, without openly avowing his purpose, all information in respect to the trust-estates he was bound to account for, and disclose to the heir and the courts his dealings with them; to render the ascertainment of their amount impossible; to fraudulently absorb and appropriate them to his own use, and to render redress impossible, for want of friends and means to prosecute the litigation; and that in the prosecution of his purpose, the record discloses, he showed wonderful fertility and resources, and a relentlessness amounting to cruelty,— still I recognize the doctrine in equity that the Court will not omit to take into consideration the consequence of its decrees, and consider them in connection with the other circumstances in the case, and see to it that an oppressive or unjust result shall not be reached. The precise sum the *cestui que trust* should receive, and which the trustee should pay, is that which the former has lost by the failure of the latter to honestly and properly administer the trust. Where the trustee has misappropriated the fund, or neglected to invest it when he should, the *cestui que trust* will be presumed to have lost, at least,

the lawful interest upon the same; and, if the fund has been so used that the accumulations in the hands of the trustee reach beyond the interest on the fund, the court will decree to him, as his loss, whatever may have been so received.

If the trustee fails or refuses to account, he may be charged with the fund, and such accumulations thereon as the best management of the most successful business men would be likely to secure for it, as it will be presumed the trustee has received as much, or he would have reported his gains, and which will in such case be held the measure of the *cestui que trust's* loss. · If such gains have been greater than the interest, or the interest compounded, it is given to the beneficiary, not on the ground that it would be presumed to earn a larger sum, but because the court will not allow the trustee to take profit from his own wrong; and that, as between him and the beneficiary, the latter has the better right to the excess, the interest of no other person being involved therein. If, however, the trustee has shown an utter disregard for the interest of the beneficiary, and deliberately planned to absorb the trust fund by his fraudulent disposition of it to his use, and attempts to destroy or suppress the evidence of his management of the fund, and the profits he has received therefrom, and so far succeeds in his purpose that no one but himself can trace the fund or its accumulations, and when called upon to account he renders false and fictitious accounts, so defective as to be impossible of proper judicial investigation and adjudication, in such case, if the amount of the fund which he has used can be ascertained, he may be charged therewith, and the largest profits that can lawfully be made ᵗʰereon by the most sagacious and expert business men ᵗʰᵉir management of money, even to the allowing of ᵈ interest at the highest lawful rates, and mak-

ing rests annually or semi-annually, if it shall appear just and equitable to the court, in securing to the *cestui que trust* the use of his property of which he has been deprived. The law entitles him to all the accumulations of his property while in the trustee's hands, and, under the circumstances stated, when he refuses to account, it will be presumed he has received such accumulation, and that such amount is the beneficiary's loss, and a court of equity may give it to him.

Such sum is not awarded for the purposes of punishing or imposing a penalty on the trustee for his maladministration of the trusts. Courts of equity do not impose or enforce penalties, or punish parties for their wrongs in the administration of trusts, but only furnish the adequate means of redress when the law fails so to do. Beyond this they do not go, unless so directed by the law-making power. *Gott v. Culp*, 45 Mich. 265 (7 N. W. Rep. 766); *Moyer v. Fletcher*, 56 Id. 508 (23 N. W. Rep. 198); *Heath v. Waters*, 40 Id. 457; *Loomis v. Armstrong*, 49 Id. 521 (14 N. W. Rep. 505); *Roberts v. Kelsey*, 38 Id. 602; *Chittenden v. Witbeck*, 50 Id. 401 (15 N. W. Rep. 526); *Dwight v. Blackmar*, 2 Id. 330; 2 Pom. Eq. Jur. 655, 658; 1 Story, Eq. Jur. 322; 1 Perry, Trusts, § 205; 2 Williams, Ex'rs, 938; 4 Kent, Comm. 429; *Nelson v. Hayner*, 66 Ill. 487; *Case v. Abeel*, 1 Paige, 393; *Sheldon v. Rice Estate*, 30 Mich. 296; 2 Redf. Wills, 882; *Berwick v. Halsey*, 4 Redf. Sur. 18; *Clarkson v. De Peyster*, Hopk. Ch. 424; 2 Kent, Comm. 230; *Heward v. Slagle*, 52 Ill. 336; *Brown's Estate*, 11 Phila. 127; *Cornell v. Gallaher*, 16 Cal. 367; Hill, Trustees, 429, 812, 839; *Anderson v. Lemon*, 8 N. Y. 236; *Mitchell v. Reed*, 61 Id. 123, 84 Id. 556.

In this case, it clearly appears that both the accou of Horace J. Perrin, as presented, as surviving p and of his administration of the Sibley estat

uncertain, erroneous, imperfect, and fraudulent as to be unfit for judicial investigation, and that we now have before us all the testimony that can be obtained, material, relating thereto; and, for these and other reasons hereinbefore stated, we think it should be held that the defendants Lepper and Fisk must have of the estate of Horace J. Perrin, now under the control of the complainant as his administrator, a return of the capital Joseph Sibley put into the firm of H. J. Perrin & Co., fixed, at the date of his death, at the sum of $104,000, with interest thereon computed at the rate of 10 per cent. from October 7, 1864, to January 11, 1880, and from the last-named date, on the amount of said principal and interest, to wit, $262,715.55, at the rate of 7 per cent. until the date of entering the decree in this Court, amounting to the sum of $426,029.66, with costs of both courts to defendants Lepper and Fisk, in this suit, to be taxed by the clerk of this Court, including a solicitor's and counsel fee of $20,000,—said sum of $426,029.66 to be paid by the complainant, as executor, from the property of the estate of Horace J. Perrin, as follows: $100,000, and the costs as taxed, including said solicitor's fee, within 90 days, $163,014.88 within six months, and the remaining sum of $163,014.88 within one year, from the date of the entry of this decree, with interest at 7 per cent. on each of said installments until paid; and that said sums, when so paid, shall be in full satisfaction of all claims of Mrs. Fisk to the estate of Joseph Sibley, under his last will, except so far as it relates to the real estate which was held in common by Horace J. Perrin and Joseph Sibley at the time of the latter's death.

The real estate in the firm name, or belonging to the firm, whether held in trust or otherwise, is decreed to be personal property and assets of the firm of H. J. Perrin & Co.; and defendants Lepper and Fisk are hereby

directed and decreed to quitclaim, release, and assign all right, title, or interest they have, or claim to have, therein, to the administrator of Horace J. Perrin.

The tenant in common property, standing in the name of Horace J. Perrin and Joseph Sibley, is declared to be and to belong to the defendant Fisk, and the heirs of Horace J. Perrin, in the proportion of one-half to Mrs. Fisk and the other half to the heirs of Horace J. Perrin.

That portion of the real estate alleged in the bill to be tenant in common property, which has been sold or conveyed away, if any, the Court doth declare and decree as follows: That Horace J. Perrin had in his hands, at all times, sufficient funds belonging to the estate of Joseph Sibley to pay and discharge all taxes, liens, and incumbrances, and it was his duty to keep the title to such property intact; and if it be found, upon reference, that he has permitted or caused such lands to be sold, and the title placed in outside parties, it is declared that he shall be chargeable with the value of the one-half of the said lands, belonging to the said Sibley estate, at the date of such sale or sales, and shall account with defendants Lepper and Fisk therefor at that date, and shall be charged with interest thereon at the rate of 4 per cent. to the date of this decree. To this end a reference will be had to a commissioner, to be designated by the circuit judge of the Calhoun circuit, to ascertain and determine what land was owned as tenants in common by Joseph Sibley and Horace J. Perrin at the time of said Sibley's death, the title to which has been incumbered or clouded by any sale or conveyance thereof since such death; and also what lands so owned as tenants in common, if any, have been transferred; and, upon the coming in of the report of such commissioner, the said circuit court shall enter a final decree, in accordance with this opinion, in respect to said tenant in common lands.

The claims presented against the estate of Joseph Sibley, before the commissioners for allowance, and found in their report, under the heading, "Claims against H. J. Perrin and J. Sibley and H. J. Perrin & Co., presented against the estate of J. Sibley, deceased," were all improper claims for allowance against the estate of Joseph Sibley, and the allowance of the same, or of any portion thereof, must be held void, and decree will be entered accordingly.

Decree will also be entered in regard to the interests of defendants known as the Sibley heirs, under the will of Joseph Sibley, that they have no such interest as is claimed by them under said will; and that as to the defendants Perrin the bill will be allowed to stand for such further proceedings as they may desire to take, or as they shall be advised may be necessary, to protect any rights they may have in the premises, and the costs, as between them and complainant, will abide the final disposition of such defendants' interests in this suit.

The decree entered in this cause, and appealed from, will be modified, and entered as herein directed, which entry will be made of this date.

CHAMPLIN, MORSE, and LONG, JJ., concurred. CAMPBELL, J., did not sit.